**Don De WIT, High Line Pork, Robert Cash, Dan Murphy, and Double V Dairy, Plaintiffs,**

v.

**FIRSTAR CORPORATION, Firstar Bank Milwaukee, N.A., Firstar Bank Wausau, N.A., Firstar Bank Sioux City, N.A., and Mark J. Miley, Defendants and Third–Party Plaintiffs,**

v.

**Lee VAN VELDHUIZEN, Third–Party Defendant.**

No. C 94–4052.

United States District Court, N.D. Iowa, Western Division.

March 1, 1995.

William P. Dixon of Davis, Miner, Barnhill & Galland, Madison, WI, and Randall A. Roos of the Roos Law Office, P.C., Sioux Center, IA, for plaintiffs.

Thomas L. Shriner, Jr., and James M. Caragher of Foley & Lardner, Milwaukee, WI, for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

BENNETT, District Judge.

## TABLE OF CONTENTS

I. *PROCEDURAL AND FACTUAL BACKGROUND* .................................... 954
 A. *Procedural Background* ............................................. 954
 B. *The Amended Complaint* ............................................. 955
 C. *The Third–Party Complaint* ........................................ 957
 D. *Factual Background* ............................................... 957

II. *LEGAL ANALYSIS* ......................................................... 959
 A. *The Motion To Dismiss And Plaintiffs' Federal Claims* ............. 959
 B. *Standards For Dismissal Pursuant to Rule 12(b)(6)* ................ 959
 C. *The RICO Claim* ................................................... 960
 1. *Scope And Purpose Of RICO* ................................... 960
 2. *Elements Of Plaintiffs' § 1962(c) RICO Claim* ................ 962
 a. *"Conduct ..."* ........................................... 962
 b. *"Of an enterprise ..."* .................................. 966
 c. *"Through a pattern ..."* ................................. 968
 d. *"Of racketeering activity ..."* .......................... 970
 i. *Mail and wire fraud.* ................................ 970
 ii. *Securities fraud.* .................................. 974
 iii. *Bankruptcy fraud.* ................................. 974
 D. *Securities Laws Violations* ....................................... 975
 1. *The Definition Of "Securities"* .............................. 977
 2. *"Investment Contracts" And The Howey Test* ................... 977
 a. *Investment of money* ..................................... 978
 b. *Common enterprise* ....................................... 978
 c. *Expectation of profit from the effort of others* ......... 980
 d. *Other cattle investment schemes* ......................... 982
 3. *Definition Of A "Seller" Of Securities* ...................... 984
 a. *Liability for solicitation* .............................. 984
 b. *"Control person" liability* .............................. 986
 c. *Liability for failure to make disclosures* ............... 987
 E. *Common Law Fraud* ................................................. 989
 F. *Common Law Wrongful Conversion Or Set–Off* ....................... 990
 1. *Standards For Dismissal Pursuant to Rule 12(b)(7)* ........... 990
 2. *Are The Trustees Indispensable Parties?* ..................... 995
 a. *Necessary party under Rule 19(a)* ........................ 995
 b. *Indispensable party under Rule 19(b)* .................... 997
 G. *Lack Of A Federal Question* ....................................... 997

III. *CONCLUSION* ........................................................... 998

---

This lawsuit raises probing and nettlesome questions of whether parties injured by the collapse of a cattle investment scheme have stated claims against the banks that allegedly crossed the line dividing mere provision of banking services from intimate involvement in and control of the investment scheme. Plaintiffs also allege that when collapse of the investment scheme became imminent, the banks moved ruthlessly to protect their own financial interests to the substantial injury of investors in and suppliers to the investment scheme. Many of the issues involved in this motion to dismiss boil down to the essential question of with what specificity must plaintiffs identify the particular defendant or defendants involved in wrong-doing and allege the nature and circumstances of that wrongdoing in order to defeat a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6)?

Plaintiffs, investors in and suppliers to a cattle investment scheme called "Adventure Cattle," filed this lawsuit on behalf of two proposed classes: the first class is defined as investors in the investment scheme, and the second is defined as persons who sustained losses as the result of defendants' banking practices. The classes have not yet been certified by the court. Defendants are a bank holding company and subsidiary banks that provided banking services for Adventure Cattle and its principal, and the bank officer responsible for the accounts in question. Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), the Securities Acts of 1933 and 1934, and assert state common law claims of wrongful conversion or set-off and fraud. Defendants have moved to dismiss the complaint for failure to state a claim upon which

relief can be granted and for failure to join necessary parties.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

Plaintiffs filed their original complaint in this matter on June 27, 1994, as the result of the collapse of a cattle investment scheme called "Adventure Cattle." The investment scheme giving rise to the claims in this matter was operated by John Morken through his company, Spring Grove Livestock Exchange (SGLE). However, Morken and SGLE are not parties to this lawsuit, as each is currently in bankruptcy. A first amended complaint, asserting a class action in five counts, was filed on September 8, 1994. The named plaintiffs are Don De Wit, an Iowa resident, High Line Pork, an Iowa partnership, Robert Cash, a resident of Nevada, Dan Murphy, a resident of California, and Double V Dairy, a/k/a Double V Cattle, an Oregon partnership consisting of Arthur Van Veldhuizen and Mary Ann Van Veldhuizen. Defendants are Firstar Corporation, identified as a bank holding company that owns the other defendant national banks, those banks, identified as Firstar Bank Milwaukee, N.A. (Firstar Milwaukee), Firstar Bank Wausau, N.A. (Firstar Wausau), Firstar Bank Sioux City, N.A. (Firstar SC), and, finally, Mark J. Miley, alleged to be an officer and agent of Firstar Milwaukee, Firstar Wausau, and Firstar Corporation. Throughout the complaint, the defendants are referred to collectively as "Firstar," and only rarely are any of the defendants identified individually.

The amended complaint asserts that each of the named plaintiffs was "victimized by the Defendants' conduct as an investor in Adventure Cattle and as a person or business who sustained loss by reason of the Firstar banking practices" described in the complaint. Complaint, ¶ 18. The amended complaint also asserts that the named plaintiffs, as representative parties, "can and will fairly and adequately protect the interest of the class." Complaint, ¶ 19. Although para-graph 19 refers only to "the class," the complaint identifies two classes of plaintiffs on whose behalf the complaint has been brought: "1) all persons, businesses, or other entities investing in the investment scheme called "Adventure Cattle" ... and 2) all persons, businesses, or other entities who sustained losses as a result of [defendants'] banking practices...." Complaint, ¶ 15.[1] The complaint further asserts that Class 1 includes approximately 78 members, while Class 2 includes at least 150 members. Members of both classes are allegedly dispersed throughout the United States. Although plaintiffs have moved for certification of the classes, the court has not yet ruled on certification.

Defendants answered the amended complaint on October 11, 1994, and at the same time filed a third-party complaint against Lee Van Veldhuizen and the present motion to dismiss. The third-party defendant answered the third-party complaint on December 9, 1994. Defendants were granted leave to file an overlength brief in support of the motion to dismiss, and filed such a brief on October 19, 1994. The plaintiffs were granted an extension of time to resist the motion, and ultimately filed their resistance to the motion to dismiss on December 2, 1994. Defendants then filed a reply brief on December 8, 1994.

The court held telephonic oral arguments on defendants motion to dismiss on February 23, 1995. Plaintiffs were represented at oral arguments by counsel William P. Dixon of Davis, Miner, Barnhill & Galland, in Madison, Wisconsin, and Randall A. Roos of the Roos Law Office, P.C., in Sioux Center, Iowa. Defendants were represented at the oral arguments by Thomas L. Shriner, Jr., and James M. Caragher of Foley & Lardner, in Milwaukee, Wisconsin. Third–Party defendant Lee Van Veldhuizen was also present telephonically at the oral arguments, but did not offer any argument on the matters presented in defendants' motion to dismiss. This matter is now fully submitted. The

---

1. The complaint appears to assert in the portion of paragraph 18 quoted above that each of the

named plaintiffs belongs to both classes.

court therefore turns to the allegations of the amended complaint and the grounds defendants urge for dismissal.

### B. The Amended Complaint

Count I of the amended complaint alleges a violation of the provision of the Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962(c), which pertains to interest in or control of a RICO enterprise.[2] The complaint alleges that "[f]rom at least September 30, 1993, and through June 3, 1994," defendants, identified collectively as "Firstar," participated "directly and/or indirectly" in and were associated with Morken's RICO enterprise. Complaint, ¶ 43.[3] The "pattern" of racketeering alleged in this count includes mail and wire fraud, fraud in the sale of securities, a scheme to defraud investors, and filing of false affidavits in bankruptcy. Complaint, ¶ 44.[4] The plaintiffs seek, on behalf of the plaintiffs in proposed Classes 1 and 2, as remedies for the violations alleged in this count, an injunction against further racketeering activity, treble damages for the losses plaintiffs incurred, prejudgment interest, costs, and reasonable attorney fees. Defendants assert as grounds for dismissal of this count that they did not "conduct" Morken's enterprise, even if it was a "RICO enterprise," that there is no "pattern" of racketeering activity upon which to found the claim, and that there are no "predicate acts" supporting the RICO claim.

Counts II and III of the amended complaint allege violations of the Securities Acts of 1933 and 1934. The gravamen of Count II is that "Firstar" was a "seller," along with Morken, of unregistered securities in the form of Adventure Cattle investment contracts in violation of §§ 5 and 12(1) of the 1933 Act.[5] Plaintiffs seek, on behalf of the plaintiffs in Class 1, recision or its equivalent, prejudgment interest, costs, and attorney fees. Count III alleges violation of § 12(2) of the 1933 Act, and § 10(b) of the 1934 Act and

---

2. The RICO provision in question states as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

3. Paragraph 43 of the Complaint makes the following allegations:

> From at least September 30, 1993, and through June 3, 1994, Firstar was associated with Morken's enterprise, and it participated directly and/or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Among other things, Firstar solicited and created the banking scheme which permitted Morken to operate his Adventure Cattle business as well as his other businesses. Additionally, Firstar helped promote the Adventure Cattle business and helped create a false picture of Morken's finances by soliciting investors in Adventure Cattle and by representing to investors and banks contemplating financing investors that Adventure Cattle and Morken were financially strong. Also, Firstar's agent, Mark Miley, worked directly with Morken in 1993 and 1994 to insure that Morken was able to keep the banking scheme operating knowing that Morken's business ventures were in terrible financial trouble. Indeed, so pervasive was Firstar's involvement in the banking scheme it had created that it had the ability to decide who among Morken's investors and creditors would be paid. Finally, because the banking scheme created by Firstar was contrary to reasonable and prudent banking practices, Firstar could have terminated its relationship with Morken at any time. Had Firstar ended its banking scheme with Morken, no other lending institution who knew what Firstar knew would have agreed to lend Morken the money he needed in the manner he needed it to keep his ventures afloat. As a result of all these facts Firstar had substantial control over all of Morken's enterprises including Adventure Cattle.

4. These allegations of a pattern of racketeering activity will be addressed separately in this opinion, and therefore will be quoted in full in the course of the analysis of each claim.

5. Paragraph 49 of the amended complaint is as follows:

> Firstar was a "seller," along with Morken, of the Adventure Cattle contracts, or it conspired with Morken in the sale of unregistered securities, by its solicitation of prospective purchasers, its financing of such purchasers, and its payment of finders' fees to persons for finding purchasers who would finance their participation in the program through Firstar Bank Sioux City; or it was a joint venturer with Morken in the sale and issuance of said unreg-

Rule 10b–5 promulgated thereunder.[6] More specifically, it alleges that "Firstar" and Morken issued the Adventure Cattle contracts in violation of the securities acts, because they "failed to disclose material facts to purchasers in connection with the sale and issuance" of the contracts, thereby violating the cited provisions. Complaint, ¶ 52. Further, it asserts that "Firstar" knew of and connived in Morken's breach of his fiduciary duty to investors by failing to disclose Morken's and SGLE's insolvent financial condition in order to enhance Firstar's own financial position, Complaint, ¶ 53 & ¶ 56, that "Firstar" used its "controlled disbursement" services as a "manipulative and deceptive device or scheme" in connection with the purchase or sale of securities, Complaint, ¶ 54, and that "[b]oth Morken and Firstar" used the means of interstate commerce to operate the "controlled disbursement" system. Complaint, ¶ 55. Thus, Count III alleges that "Firstar" was a joint venturer, "controlling person," or "underwriter" in the Adventure Cattle program. Complaint, ¶ 57. This count seeks, on behalf of the plaintiffs in Class 1, damages equal to their losses, prejudgment interest, costs, and attorney fees. In their motion to dismiss Counts II and III, defendants assert that the Adventure Cattle contracts were not "securities," that defendants were not "sellers" of the contracts even if they were "securities," and that there has

consequently been no violation of either § 12 of the 1933 Act or § 10(b) of the 1934 Act by these defendants.

Count IV of the amended complaint is a state common-law claim of wrongful conversion or set-off. Specifically, it alleges that "Firstar" set-off Adventure Cattle proceeds against the overdraft balances of Morken's and SGLE's accounts in wilful disregard of the rights of investors who had an immediate, possessory right to those proceeds greater than any rights of Morken, SGLE, or Firstar. Complaint, ¶ 59–62.[7] This count prays as relief, on behalf of the Class 1 plaintiffs, disgorgement and return by the defendants of all the proceeds received from the sales of cattle owned by Adventure Cattle, punitive damages, prejudgment interest, costs, and attorney fees. Defendants assert as grounds for dismissal of this claim failure to join necessary parties defendants identify as the trustees in bankruptcy of both Morken's and SGLE's estates.

Count V of the amended complaint alleges state common-law fraud by the defendants in the continued "prop[ping] up" of Morken's ventures from September 1993 through June 2, 1994, upon which plaintiffs of both classes relied to their detriment. Complaint, ¶ 64 & 65.[8] Plaintiffs assert that defendants conduct with respect to this count was wilful and outrageous. Complaint, ¶ 67. Plaintiffs seek the same remedies, on behalf of both classes

---

istered securities; or it was an underwriter of said securities.

**6.** Plaintiffs also asserted a violation of § 17 of the 1933 Act, but upon defendants' assertion that there is no private cause of action for violation of that provision, plaintiffs have withdrawn that claim.

**7.** The allegations of wrongful conversion or set-off are as follows:

59. From and after June 2, 1994, the investors in the Adventure Cattle program had an immediate possessory right to the proceeds from the sale of those cattle, which rights were greater than any rights that could be claimed therein by Morken, by SGLE, or by Firstar.

60. Firstar's setoff of Adventure Cattle proceeds against the overdraft balance of SGLE accounts, and its subsequent attempts to obtain fattened cattle proceeds not yet paid by various packers for Adventure Cattle, and its subsequent exercise and assertion of dominion and control over these proceeds, consti-

tutes a misappropriation and conversion of funds that did not belong to Firstar.

61. Firstar's setoff of the Adventure Cattle proceeds against Morken's overdraft balance was unlawful, without any justification or excuse, and has resulted in severe injury to the Plaintiffs.

Amended Complaint, ¶¶ 59–61.

**8.** The specific allegations in this count are as follows:

64. From at least September, 1993 through June 2, 1994, Firstar defrauded the Adventure Cattle investors and SGLE suppliers by continuing to prop up Morken's ventures through the honoring of overdrafts and by working independently and with Morken to assure investors and suppliers that Morken's business ventures were financially sound.

65. The Plaintiff class relied upon the false financial picture created by Morken and Firstar in deciding to invest in Adventure Cattle and in deciding to continue to supply SGLE.

of plaintiffs, which they sought in Count IV. Defendants assert as grounds for dismissal of this count that the allegations of fraud are insufficiently pleaded. As an alternative to dismissal of the entire complaint, defendants argue for a stay, so that any and all allegations may be litigated through the proper forum, the bankruptcy court, where all necessary parties can be joined.

### C. The Third–Party Complaint

On October 11, 1994, along with their answer and motion to dismiss, defendants filed a third-party complaint against Lee Van Veldhuizen. That third-party complaint alleges that the Adventure Cattle program was conceived by Van Veldhuizen, and that it was Van Veldhuizen who solicited and received "finders' fees" from lenders in return for steering investors to them. Third–Party Complaint, ¶ 5. The third-party complaint also alleges that Van Veldhuizen knew more about Morken's operations than did defendants. Third–Party Complaint, ¶ 6. Therefore, the third-party complaint asserts that if defendants are liable at all on the plaintiffs' claims, Van Veldhuizen is liable to the defendants for contribution. Third–Party Complaint, ¶ 7.[9]

Because this third-party complaint only seeks contribution from the third-party defendant in the event the principal defendants are found liable to the plaintiffs, if the plaintiffs' amended complaint must be dismissed in its entirety for any reason, then the third-party complaint should also be dismissed.

### D. Factual Background

The amended complaint alleges the following facts to be true. Beginning in 1992, Morken made an agreement with defendants to permit Morken and SGLE to market investment contracts in cattle by establishing a banking system from which defendants would be able to reap huge fees, thus circumventing loan and interest regulations. Under this system, defendants with Morken established three bank accounts to generate a "float" as an open-ended line of credit maintained through "controlled disbursement services," for which defendants were able to charge substantial fees, thereby creating a de facto loan relationship but falling outside the scope of normal banking rules and regulations for loans. Complaint, ¶ 23.[10] Further-

---

9. The pertinent allegations of the Third–Party Complaint are as follows:

 5. Upon information and belief, Van Veldhuizen conceived the so-called "Adventure Cattle program" and, acting as an employee of and agent for John Morken, sold the cattle feeding contracts to the plaintiffs. Upon information and belief, Van Veldhuizen solicited and received "finders' fees" from lenders in return for steering investors to them. Firstar Bank Sioux City, N.A., was solicited by Van Veldhuizen to pay finders' fees.

 6. At all times material, Van Veldhuizen knew more about Morken's operations of the so-called "Adventure Cattle program," than did the defendants.

 7. The defendants deny all liability to the plaintiffs, but if and to the extent that they are held liable, Van Veldhuizen is liable to the defendants for contribution.

 8. But for the automatic stay of 11 U.S.C. § 362(a), which prevents their naming John and Dorothy Morken as third-party defendants herein, the defendants would also sue John and Dorothy Morken for contribution, based on the same claim asserted herein against Van Veldhuizen, and further based upon the fraud which the Morkens have perpetrated against Firstar Bank Milwaukee, N.A., a fraud of which the plaintiffs may also be victims. First Bank Milwaukee, N.A.'s claim against the Morkens would be as artic-

 ulated in its complaint objecting to the dischargeability of their debt to it in the bankruptcy court, a true copy of which is attached hereto as Exhibit B.

 WHEREFORE, the defendants and third-party plaintiffs demand judgment against third-party defendant Lee Van Veldhuizen for contribution in the event that the defendants are held liable to the plaintiffs, for their costs and disbursements of this action as allowed by law, and for such other relief as shall be just.

 Third–Party Complaint, ¶¶ 5–8.

10. Specifics of the accounts are alleged to be as follows:

 Firstar established a demand deposit account for Morken at Firstar Bank Milwaukee; Firstar also established a demand deposit account at Milwaukee for Morken's corporation, SGLE, which was to be operated as a "lock box" depository account to receive the deposit of funds payable to either Morken or SGLE; Firstar also established a demand deposit account for SGLE at Firstar Bank Wausau which was operated as a disbursement account for the payment of SGLE and Morken obligations, and which was funded through the "controlled disbursement" scheme by electronic funds transfers that were automatically made to that account from the SGLE account in Milwaukee.

more, under the banking scheme, Firstar allowed Morken to write checks on one account without sufficient good or collected funds in that account to cover overdrafts in other of Morken's accounts. Complaint, ¶ 24. The banking scheme was designed to facilitate. Morken's Adventure Cattle investment program, which involved sale of a specific group of cattle to the investor with a guaranteed 25% annualized return.[11]

Firstar was fully aware of the manner in which Morken conducted his business, and at least until June 2, 1994, participated in expansion of Morken's investment scheme. Complaint, ¶ 28. Specifically, plaintiffs assert that defendants promoted and solicited participation of investors in Adventure Cattle through Firstar SC, encouraged loans by that subsidiary to finance investments in the scheme up to an aggregate of $20 million, and encouraged other lenders to finance investors. Complaint, ¶ 28(a). Defendants are also alleged to have extended substantial amounts of unsecured credit to Morken, allowed him to write insufficient fund checks

on his various accounts, and encouraged his use of the "float." Complaint, ¶ 28(b). At the same time, defendants controlled the flow of cash among the various accounts and among investors, banks, and suppliers of the scheme, Complaint, ¶ 28(c), paid finders fees for qualified investors, Complaint, ¶ 28(d), and thus actively promoted the belief that Morken was financially strong and good for his guarantees even in a deteriorating cattle market. Complaint, ¶ 28(e).

Plaintiffs assert that at least by September 30, 1993, defendants knew that Morken's investment scheme was unravelling in the face of a continuing slump in the cattle market and Morken's huge overdrafts. Defendants then began a program to enhance their own financial position at the expense of all other parties involved in the investment scheme either as investors or suppliers. Even though defendants knew as early as September of 1993 that funds including sale proceeds from Morken's cattle transactions and proceeds from sale of Adventure Cattle ani-

 a. The multiple accounts at the various Firstar Banks were established and operated to enable Morken to generate and maintain a substantial "float" in the accounts, thereby effecting a substantial loan from Firstar to Morken through the unrestricted grant of privileges to write checks on those accounts without sufficient collected funds in the accounts to cover the checks.

 b. Morken was advised and encouraged by Firstar to treat the float as an open ended line of credit to be used in Morken's enterprise, and both Morken and Firstar operated the accounts consistently within those instructions.

 c. Firstar's purpose in establishing the "controlled disbursement" services was to enable it to charge substantial fees or interest to Morken/SGLE for use of the float, thereby establishing a de facto loan relationship that was calculated to be outside the scope of normal banking rules and regulations relating to loans.

Complaint, ¶ 23.

11. Paragraph 26 of the amended complaint alleges that

Morken's operation of the Adventure Cattle program worked as follows:

 a. Morken would sell a specific group of cattle, to be located at a particular feed lot, to the purchaser.

 b. The purchaser would invest $100 of his own funds for each head of cattle purchased,

and would obtain a fully secured loan for the balance of the purchase price and for the expected feed costs from his own bank. These banks included Farm Credit Services of Southern Minnesota, Firstar Bank of Sioux City, First National Bank of Sioux Center, Iowa, Peoples Bank of Rock Valley, Iowa, American State Bank of Sioux Center, Iowa, Sioux County State Bank of Orange City, Iowa, and other financing organizations as shown on Exhibit B, "Bank List", attached hereto. Each Purchaser's financing organization would generally secure itself with a perfected UCC Article 9 security interest in the cattle purchased. The cattle would be kept at various feedlots located in Iowa, South Dakota, Nebraska and Kansas.

 c. Feed and yardage expenses relative to the cattle would be charged by the feedlots directly .to the purchaser, and the purchaser was responsible for payment of all feed and yardage expenses.

 d. Morken monitored each group of cattle purchased and he guaranteed each investor a 25% annualized return (in effect, about $8.00 per head since the cattle were usually sold within three months) after sale of the cattle on the Purchaser's initial $100 per head investment. In return, Morken was entitled to any proceeds from the sale of the cattle in excess of the production cost plus the guaranteed return on the Purchaser's initial equity injection. Market losses on Adventure Cattle program cattle were assumed by Morken.

mals were being commingled in the SGLE accounts, and further knowing how Morken conducted his financial operations, Complaint, ¶ 30, defendants continued to solicit investors and portray Morken as financially sound, while preparing to collapse the "float" and seize all available funds to service Morken's overdrafts. Complaint, ¶ 34–37. The decision to collapse the "float" was made in April of 1994, but no action to do so was taken until June 2, 1994, when defendants began selectively to dishonor checks drawn on Morken's accounts. Complaint, ¶ 37–38. As a result, Morken and SGLE were forced into bankruptcy, and investors and suppliers were left with millions of dollars of losses on their investments or unpaid accounts.

Defendants assert that far from conducting Morken's "RICO enterprise" or otherwise engaging in any of Morken's wrong-doing, they are Morken's principal victims. They assert that Morken's banking scheme involved massive check-kiting, which has cost them severe damage.

## II. LEGAL ANALYSIS

### A. The Motion To Dismiss And Plaintiffs' Federal Claims

Defendants have moved to dismiss plaintiffs' federal claims, alleging violations of RICO (Count I) and provisions of the Securities Acts (Counts II and III) on the ground that these counts fail to state claims upon which relief can be granted. The court will therefore consider first the standards for dismissal for failure to state a claim pursuant to *Fed.R.Civ.P.* 12(b)(6), then turn to a legal analysis of the adequacy of each of the federal claims.

### B. Standards For Dismissal Pursuant to Rule 12(b)(6)

■ The Eighth Circuit Court of Appeals has long recognized that motions pursuant to *Fed.R.Civ.P.* 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted "can serve a useful purpose in disposing of legal issues with the minimum of time and expense to the interested parties." *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). The issue

is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of the plaintiff's claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989). The Rule provides that

> [e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted....

*Fed.R.Civ.P.* 12(b)(6).

■ The standards for dismissal under Rule 12(b)(6) were recently restated in *Carney v. Houston,* 33 F.3d 893 (8th Cir.1994):

> We must construe the allegations in the complaint in the light most favorable to [plaintiff], *see* [*Concerned Citizens of Neb. v. United States Nuclear Reg. Comm'n,* 970 F.2d 421, 425 (8th Cir.1992)], and should not approve dismissal of his complaint for failure to state a claim unless "it appears beyond doubt that [he] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957).

*Carney,* 33 F.3d at 894. Thus, in considering a motion to dismiss under *Rule* 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The *Rule* does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). Thus, it is only in the "unusual case" where the complaint on its face reveals some insuperable bar to relief that a dismissal under *Rule* 12(b)(6) is warranted. *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982).

■ A motion to dismiss ordinarily requires the court to review only the pleadings

to determine whether the pleadings state a claim upon which relief can be granted. *Fed. R.Civ.P.* 12(b). However, where on a Rule 12(b)(6) motion to dismiss "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Fed.R.Civ.P.* 12(b)(6); *see also Osborn v. United States,* 918 F.2d 724, 729 (8th Cir.1990) (distinguishing between standards for dismissal under Rule 12(b)(1) and Rule 12(b)(6), and stating that "Rule 12 requires that Rule 56 standards be applied to motions to dismiss for failure to state a claim under Rule 12(b)(6) when the court considers matters outside the pleadings. [Citations omitted.]"). The parties in this case have restricted themselves to the face of the pleadings, and have argued the motion to dismiss solely on the basis that, assuming plaintiffs' allegations to be true, they do not state a claim on which relief can be granted. With the standards articulated above in mind, therefore, the court will consider defendants' motion to dismiss plaintiffs' federal claims for failure to state a claim pursuant to *Fed.R.Civ.P.* 12(b)(6).

### C. The RICO Claim

Defendants make several challenges pursuant to *Fed.R.Civ.P.* 12(b)(6) to plaintiffs' RICO allegations. Defendants assert as grounds for dismissal of this count that they did not "conduct" Morken's enterprise, even if it was a "RICO enterprise," that there is no "pattern" of racketeering activity upon which to found the claim, and that there are no "predicate acts" supporting the RICO claim. Plaintiffs contend that they have adequately pleaded each of these elements of a RICO claim.

### 1. Scope And Purpose Of RICO

■ The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968,

imposes criminal and civil liability upon those who engage in certain "prohibited activities." Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof either of "a pattern of racketeering activity" or of "collection of an unlawful debt." "Racketeering activity" is defined in RICO to mean "any act or threat involving" specified state-law crimes, any "act" indictable under various specified federal statutes, and certain federal "offenses," 18 U.S.C. § 1961(1) (1982 ed., Supp. V); but of the term "pattern" the statute says only that it "requires at least two acts of racketeering activity" within a 10–year period, 18 U.S.C. § 1961(5).

*H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 481, 105 S.Ct. 3275, 3277, 87 L.Ed.2d 346 (1985); *Manion v. Freund,* 967 F.2d 1183, 1185 (8th Cir.1992) (quoting *H.J. Inc.*); *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 768 (8th Cir.1992).[12] Crimes not specified in § 1961 cannot support a RICO claim. *Manion,* 967 F.2d at 1186 (breach of fiduciary duty is not one of the specified state crimes listed in the definition of "racketeering activity," 18 U.S.C. § 1961(1), and thus could not support a civil RICO claim).

■ The Supreme Court identified the purpose of RICO as follows:

The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its fo-

---

**12.** Racketeering activities defined in § 1961(1) include murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, specified federal offenses indictable under title 18, including such offenses as bribery, counterfeiting, embezzlement, wire and mail fraud, witness tampering, interstate gambling offenses, other interstate offenses, and dealings in contraband, specified federal offenses indictable under title 29, including violations of restrictions on payments and loans to labor organizations and embezzlement from union funds, and further offenses including "any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States, or ... any act which is indictable under the Currency and Foreign Transactions Reporting Act...."

cus, was not limited in application to organized crime. In Title IX, Congress picked out as key to RICO's application broad concepts that might fairly indicate an organized crime connection, but that it fully realized do not either individually or together provide anything approaching a perfect fit with "organized crime." *See, e.g.,* [116 Cong.Rec.] at 18940 (Sen. McClellan) ("it is impossible to draw an effective statute which reaches most of the commercial activities of organized crime, yet does not include offenses commonly committed by persons outside organized crime as well").

*H.J. Inc.,* 492 U.S. at 248, 109 S.Ct. at 2905; *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 990 (8th Cir.1989) (citing *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981)). Thus, RICO also imposes civil liability on other types of organizations that have no alleged ties to organized crime. *Atlas Pile Driving Co.,* 886 F.2d at 990.

However, the reach of RICO beyond the activities of organized crime has caused courts some distress:

Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put.... Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.'" Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. *United States v. Turkette,* [452 U.S. at 591, 101 S.Ct. at 2533]. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences....

It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster.

*Sedima,* 473 U.S. at 499, 105 S.Ct. at 3286. The Supreme Court regarded this extensive reach of RICO as an indication of the breadth Congress intended the statute to have, not as a defect in its drafting. *Id.* Nearly a decade ago, the Court observed, however, that "[t]he initial dormancy of this provision and its recent greatly increased utilization are now familiar history." *Id.* at 481, 105 S.Ct. at 3277. Specifically, the Court found that "[o]f 270 District Court RICO decisions prior to [1985], only 3% (nine cases) were decided throughout the 1970's, 2% were decided in 1980, 7% in 1981, 13% in 1982, 33% in 1983, and 43% in 1984." *Id.* (citing the Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 55 (1985) (hereinafter "ABA Report")); Christopher D. McDemus, *Comment: Reves v. Ernst & Young: The Supreme Court's Recent Restrictive Standard Concerning § 1962(c) of the Civil RICO Statutes,* 19 Del.J.Corp.L. 1027, 1038 (1994) (hereinafter "McDemus") ("Although Congress enacted the Organized Crime Control Act of 1970, nearly a decade passed before there were more than ten reported decisions discussing RICO."). During the 1980s, private use of RICO increased exponentially, and the increased use was not limited to criminal suits, but in fact was based on more prominent use of RICO as a cause of action in civil suits. McDemus, 19 Del.J.Corp.L. at 1038 (citing ABA Report).

A RICO action can be distinguished from an anti-trust action on two grounds. First, RICO requires multiple acts, or a pattern of predicate acts, while the Clayton Act has no such pattern requirement. *Granite Falls Bank v. Henrikson,* 924 F.2d 150, 153 (8th Cir.1991). Furthermore, the anti-trust laws attack harms of a different nature:

Unlike the Clayton Act, which targets harm to competition induced by force rather than fraud, racketeering injuries by definition include harms from fraud (securities, wire or mail fraud) and harms resulting from force (*e.g.,* extortion).

*Id.* (quoting Humes, *RICO and a Uniform Rule of Accrual,* 99 YALE L.J. 1399, 1407 (1990)).

RICO contains a civil enforcement scheme permitting private individuals harmed by criminal RICO activity to recover damages in a civil action. *Bowman v. Western Auto Supply Co.,* 985 F.2d 383, 384 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct.

2459, 124 L.Ed.2d 674 (1993). The relevant provision of the Act is as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c); *Bowman*, 985 F.2d at 384; *Diamonds Plus, Inc.*, 960 F.2d at 768 ("RICO provides a civil cause of action to those who are injured by activities violative of 18 U.S.C. § 1962 (1988)."). Under § 1964, then, any individual who has experienced injury to his or her business or property "by reason of" a RICO violation has standing to bring a private civil action. *Bowman*, 985 F.2d at 384. The litigant's injury, however, must result from a violation of 18 U.S.C. § 1962. *Sedima S.P.R.L. v. ImRex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); *Bowman*, 985 F.2d at 385.

### 2. Elements Of Plaintiffs' § 1962(c) RICO Claim

■ Plaintiffs allege that defendants have violated 18 U.S.C. § 1962(c), which is the provision of RICO that makes it "unlawful for any person ... associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c); *Bowman*, 985 F.2d at 384 n. 1; *Diamonds Plus, Inc.*, 960 F.2d at 768; *Atlas Pile Driving Co.*, 886 F.2d at 990. Thus, to establish a RICO violation under 18 U.S.C. § 1962(c) a plaintiff must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity that must include at least two racketeering acts. *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285; *United States v. Nabors*, 45 F.3d 238, 239 (8th Cir.1995) (quoting *Sedima* for the elements of the violation in a criminal RICO prosecution); *Nolte v. Pearson*, 994 F.2d 1311, 1316–17 (8th Cir.1993); *Bowman*, 985 F.2d at 385 (quoting *Sedima* ); *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 979 n. 4 (8th Cir.1991);

*Granite Falls Bank*, 924 F.2d at 153; *Atlas Pile Driving Co.*, 886 F.2d at 990; *and compare United States v. Bennett*, 44 F.3d 1364, 1373 (8th Cir.1995) (another criminal RICO prosecution in which the court stated that "[t]o prove a substantive RICO violation, the government must establish: 1) the existence of an enterprise affecting interstate or foreign commerce; 2) the defendant's association with the enterprise; 3) that the defendant participated in the conduct of the enterprise's affairs; and 4) that the defendant's participation was through a pattern of racketeering activity," citing *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984), and *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)). The court in *Sedima* concluded that

the statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Sedima*, 473 U.S. at 496–97, 105 S.Ct. at 3285–86 (footnotes omitted); *Bowman*, 985 F.2d at 385 (quoting *Sedima* ). The Eighth Circuit Court of Appeals describes this as a "proximate cause" requirement that the injury asserted be proximately caused by the predicate acts alleged. *Bowman*, 985 F.2d at 387 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992), and *Schiffels v. Kemper Fin. Serv.*, 978 F.2d 344, 351 (7th Cir.1992)). The court therefore turns to examination of plaintiffs' allegations of each of these elements of a § 1962(c) violation by the defendants in this case.

### a. "Conduct ..."

■ Where the record is "devoid of evidence that defendants participated, either di-

rectly or indirectly, in the conduct of the affairs of the enterprise," the court need not reach any other element of the § 1962(c) RICO claim before dismissing it. *Nolte,* 994 F.2d at 1317. The "conduct" element is the distinguishing element of a § 1962(c) claim, because

> [i]n their comments on the floor, members of Congress consistently referred to subsection (c) as prohibiting the *operation* of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting the *acquisition* of an enterprise. Representative Cellar, who was Chairman of the House Judiciary Committee that voted RICO out in 1970, described § 1962(c) as proscribing the "conduct of the affairs of a business by a person acting in a *managerial* capacity, through racketeering activity." 116 Cong. Rec. 35196 (1970) (emphasis added).

*Reves v. Ernst & Young,* — U.S. —, — – —, 113 S.Ct. 1163, 1171–72, 122 L.Ed.2d 525 (1993) (emphasis in the original). The court recognized that these remarks did not mean that § 1962(c) was limited to the operation or management of an enterprise, but that liability under § 1962(c) required that "one has participated in the operation or management of the enterprise itself." *Id.* at —, 113 S.Ct. at 1172.

The standards for allegations of the "conduct" element of a RICO violation employed by the Eighth Circuit Court of Appeals are those recently articulated by the Supreme Court in *Reves v. Ernst & Young,* — U.S. —, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993): [13]

> *Reves* addressed the requisite degree of participation in the conduct of the affairs of the enterprise to impose liability under RICO. In *Reves,* a partner in the defendant accounting firm was placed in charge of the audits of a Co-op gasohol plant. *Id.* at —, 113 S.Ct. at 1167. The accountant relied on existing Co-op records in preparing the audits, reviewed a series of completed Co-op transactions, certified the Co-op's records as fairly portraying its finan-

cial status, and presented the reports to the Co-op's directors and shareholders. *Id.* at — – —, 113 S.Ct. at 1167–68. The Supreme Court affirmed the test articulated in *Bennett v. Berg,* 710 F.2d 1361, 1364 (en banc) (8th Cir.), *cert. denied sub nom. Prudential Ins. Co. of America v. Bennett,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), and held "one must participate in the operation or management of the enterprise itself" to be subject to liability under section 1962(c). *Reves,* — U.S. at — – —, —, 113 S.Ct. at 1168–69, 1173. Applying this test to the defendant's conduct in the enterprise, the Court concluded it was not sufficient to impose liability. *Id.* at —, 113 S.Ct. at 1174.

*Nolte,* 994 F.2d at 1317. In *Nolte,* the Eighth Circuit Court of Appeals also found that the defendants' conduct in that case was insufficient to impose RICO liability. *Id.* The defendants were attorneys who had prepared an opinion letter and accompanying memorandum advising investors of federal income tax consequences, a defense letter agreeing to render legal assistance to investors, and two documents explaining whether changes in federal tax laws would have a material effect on an investor's income tax consequences. *Id.* at 1314. The court concluded that "there is no evidence suggesting that the attorneys participated in the operation or management of the enterprise," and the trial court had therefore properly directed a verdict in favor of the defendants on the RICO claim. *Id.* at 1317.

Because whether plaintiff's have adequately pleaded this element of a RICO violation is perhaps the most hotly contested issue in the motion to dismiss, the court must consider both the parties arguments and the Supreme Court's decision in *Reves* with some care. Defendants argue strenuously that, like the defendants in *Reves* and *Nolte,* they did no more than provide services to the RICO enterprise, and therefore did not "participate" in the "operation or management of the enterprise." Plaintiffs argue that defendants

---

**13.** The Supreme Court's decision in *Reves* cited here is the decision on certiorari affirming the Eighth Circuit Court of Appeals' decision in *Ar-* *thur Young & Co. v. Reves,* 937 F.2d 1310 (8th Cir.1991).

participated directly and indirectly in the establishment and operation of the banking scheme which allowed Morken's RICO enterprise to operate. In response, defendants argue that, far from being the architects and operators of this banking scheme which allowed the RICO enterprise to operate, they were the principal victims of *Morken's* operation and manipulation of the banking scheme.

Plaintiffs allege that defendants managed the banking scheme itself, thus participating in the conduct of the RICO enterprise. The court must therefore decide whether, assuming plaintiffs' allegations to be true, the defendants' operation of a tangential albeit essential function, which was the cornerstone upon which a RICO enterprise's operations was based, is sufficient "participation" in the "operation and management" of the RICO enterprise itself to incur RICO liability.

The Supreme Court undertook a careful analysis of the language and legislative history of § 1962(c) in order to determine the proper test for liability under that RICO subsection. *Reves,* —— U.S. at ——–——, 113 S.Ct. at 1169–1172.[14] The Supreme Court found particular significance in the fact that Congress had required "participation" in the "conduct" of the RICO enterprise's affairs, not merely "participation" in those affairs. *Id.* at ——–——, 113 S.Ct. at 1169–70. The Court concluded that

[o]n the one hand, "to participate ... in the conduct of ... affairs" must be broader than "to conduct affairs" or the "participate" phrase would be superfluous. On the other hand, as we already have noted,

"to participate ... in the conduct of ... affairs" must be narrower than "to participate in affairs" or Congress' repetition of the word "conduct" would serve no purpose. It seems that Congress chose a middle ground, consistent with a common understanding of the word "participate"— "to take part in." Webster's Third New International Dictionary 1646 (1976).

Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

*Id.* at ——, 113 S.Ct. at 1170. The Supreme Court next found this "operation or management" test to be supported by the legislative history. *Id.* at ——–——, 113 S.Ct. at 1171–72.

The Court then considered whether this test improperly limited the reach of § 1962(c) to extend liability to "outsiders" to the enterprise. *Id.* at ——, 113 S.Ct. at 1173. The

---

**14.** *Reves* resolved the issue of the appropriate test to be applied in determining whether a RICO defendant had "conducted" the RICO enterprise—an issue that had produced a dramatic split among the Courts of Appeals. The various tests applied by the courts of appeals to the "conduct" element were described, *e.g.*, by the District of Columbia Circuit Court of Appeals in *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 952–54 (D.C.Cir. 1990), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). The court identified the various tests as stated in the following cases: *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied sub nom. Anastasis v. United States,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Cauble,* 706 F.2d 1322 (5th Cir.1983), *cert. denied,* 465 U.S.

1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir.), *cert. denied sub nom. Prudential Ins. Co. of Am. v. Bennett,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Bank of America Nat'l Trust & Sav. Ass'n v. Touche Ross & Co.,* 782 F.2d 966, 970 (11th Cir.1986); *United States v. Webster,* 669 F.2d 185, 186–87 (4th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *United States v. Kovic,* 684 F.2d 512, 516 (7th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982). *Yellow Bus Lines,* 913 F.2d at 952–54. To this list, the court would add another, more complete formulation of the test used by the Seventh Circuit Court of Appeals to be found in *United States v. Horak,* 833 F.2d 1235, 1239 (7th Cir.1987).

court found four grounds for rejecting this concern:

> First, it ignores the fact that § 1962 has four subsections. Infiltration of legitimate organizations by "outsiders" is clearly addressed in subsections (a) and (b), and the "operation or management" test that applies under subsection (c) in no way limits the application of subsections (a) and (b) to "outsiders." Second, § 1962(c) is limited to persons "employed by or associated with" an enterprise, suggesting a more limited reach than subsections (a) and (b), which do not contain such a restriction. Third, § 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the *"enterprise's* affairs," not just their *own* affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself. . . .

> In sum, we hold that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs," § 1962(c), one must participate in the operation or management of the enterprise itself.

*Id.* at ——, 113 S.Ct. at 1173 (emphasis in the original).

The court concludes that plaintiffs have not alleged that defendants participated in the conduct of Morken's RICO enterprise itself. Rather, they have alleged only that defendants conducted that enterprise's banking scheme. As alleged, the court concludes that defendants' conduct was one step removed from management of the RICO enterprise itself, and thus liability will not lie under § 1962(c). This is not to say that plaintiffs have necessarily failed to allege that defendants' conduct was wrongful, either because it might be contrary to acceptable banking practices, fraudulent, or otherwise tortious. However, that conduct, if wrongful, is not cognizable under RICO's § 1962(c). Defendants have not been alleged to have had some part in directing the affairs of Morken's enterprise itself; rather, they have been alleged to have had some part only in directing conduct of the "banking scheme."

Plaintiffs asserted, both in their brief and at oral argument, that the decision in *Nebraska Security Bank v. Dain Bosworth Inc.,* 838 F.Supp. 1362 (D.Neb.1993), found that the conduct element had been met in circumstances similar to those they have alleged here. In *Nebraska Security Bank,* the court found the following:

> This case particularly involves the claim that Dain sold warrants it knew were destined for default. By possessing and exercising the right to control the interest rate on the warrants, Dain, not the [Sanitary Improvement Districts or SIDs], controlled whether the warrants were marketable. The decision regarding what rate of interest a corporation is willing to pay on its securities is central to the operation and management of the corporation. Thus, when control of the rate of interest the warrants would pay was shifted from the trustees of the SIDs to Dain, and Dain exercised that control, I believe the test set forth in *Reves* was satisfied.

*Id.* at 1367. In the present case, there is nothing like this control by defendants of a central characteristic of the investment itself. Morken alone controlled what return he would pay on investors' Adventure Cattle contracts. Furthermore, defendants did not have the other elements of control identified by the court in *Nebraska Security Bank,* such as the right to approve or withhold approval for contracts related to investment properties, control the amount and interest rate for bonds issued, or when and in what amount warrants would be issued, the right to draw upon funds of the enterprise to pay its obligations, the right to change the interest rate on the warrants, obtain assurance of payment of warrants, and file income taxes on behalf of the enterprise. *Id.* The court concludes that the defendants in *Nebraska Security Bank* exercised direct control over some aspects of the operations and management of the enterprise itself—something lacking in the present case.

It is not enough that Morken's RICO enterprise might not have been able to function without the banking scheme in place. In

*Reves,* it might not have been possible for the RICO enterprise to conduct its affairs without the certification of the defendant accountants that its records fairly represented the enterprise's financial condition. However, the defendant accountants did not thereby participate in the enterprise itself by creating the financial reports upon which the enterprise relied. *Reves,* —— U.S. at ——, 113 S.Ct. at 1169. Similarly, in *Nolte* it might not have been possible for the RICO enterprise to conduct its investment scheme without the participation of the defendant attorneys. Nonetheless, the attorneys did not participate in the operation or management of the enterprise itself by providing legal services to it or to its investors, and therefore could not incur RICO liability. *Nolte,* 994 F.2d at 1317. In each of these cases, the defendants provided only services to the enterprises, as did defendants in the present case, and even provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise.[15]

Plaintiffs argue that defendants' conduct in the banking scheme here crosses the line drawn in *Reves* and *Nolte* for the further reason that defendants exercised control of Morken's enterprise that was so extensive that they "had the ability to decide who among Morken's investors and creditors would be paid" and that no other lending institution "who knew what Firstar knew would have agreed to lend Morken the money he needed in the manner he needed it to keep his ventures afloat." Complaint, ¶ 43. The fact that a bank is selective in honoring or dishonoring checks of one of its customers, again, may be wrongful conduct, but it does not amount to control of the underlying RICO enterprise. It is merely incidental to a bank's conduct of its *own* affairs when faced with an overextended account. Simi-

larly, the fact that a bank can "walk away" from a customer, and that customer may have no other avenue for obtaining certain services, is a matter of the bank's conduct of its *own* affairs, not the affairs of the customer.

The court concludes that plaintiff's have failed to allege the first and threshold element of a RICO claim under § 1962(c), conduct of a RICO enterprise, and therefore defendants' motion to dismiss the RICO claim should be granted. Nonetheless, the court will consider, as alternatives to this holding, the adequacy of plaintiffs' allegations of the other elements of such a claim.

### b. "Of an enterprise ..."

The decisions of the Eighth Circuit Court of Appeals consistently define a RICO enterprise as exhibiting three basic characteristics:

(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering.

*Nabors,* 45 F.3d at 240 (quoting *Atlas Pile Driving Co.,* 886 F.2d at 995); *Diamonds Plus, Inc.,* 960 F.2d at 770–71 (also quoting *Atlas Pile Driving Co.*); *Atlas Pile Driving Co.,* 886 F.2d at 995. Although the first of these three characteristics has apparently not troubled courts, the second and third have prompted further clarification from the Eighth Circuit Court of Appeals.

The second characteristic, continuity of structure and personnel, does not require that members remain consistent. *Nabors,* 45 F.3d at 240. The fact that members of the enterprise withdrew from it after the enterprise allegedly began the racketeering acts alleged does not defeat the continuity requirement, because "old members [of an enterprise] may leave, and new members may join, ... [but] the personnel of an enterprise

---

**15.** This court's conclusion is in accord with the determination of other courts that provision of services to a RICO enterprise does not bring with it RICO liability. *See, e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521–22 (2d Cir.1994) (provisions of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *University of Maryland v. Peat, Marwick, Main,* 996 F.2d 1534, 1539 (3d Cir.1993) ("Sim-

ply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result," thus RICO claim against accountants had to be dismissed under Rule 12(b)(6)); *Gilmore v. Berg,* 820 F.Supp. 179, 182–83 (D.N.J.1993) (rendering professional services to enterprise "does not constitute participation in the [enterprise's] affairs.").

may undergo alteration without loss of the enterprise's identity as an enterprise." *Id.* (quoting *United States v. Kragness,* 830 F.2d 842, 856 (8th Cir.1987)). "Indeed, this circuit's definition of an enterprise specifically includes the phrase '*some* continuity ... of personnel' (emphasis supplied), *Atlas Pile Driving Co.,* 886 F.2d at 995, not 'complete continuity.'" *Id.* However, it is not necessary that the enterprise consist of more than the defendants. *Id.* In *Nabors,* the court reiterated that "the case law of this circuit specifically holds that a 'collective entity is something more than the members of which it is comprised' and that individual defendants who are members of an enterprise may indeed be found guilty (or liable) under 18 U.S.C. § 1962(c) even if the enterprise is made up solely of those defendants." *Id.* (citing *Atlas Pile Driving Co.,* 886 F.2d at 995).

Continuity of structure, like continuity of predicate acts discussed below, also requires something more than "sporadic crime." *Id.* Continuity of structure has been defined in this circuit as:

> "an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an *ad hoc* basis." *United States v. Kragness,* 830 F.2d at 856. *See also United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983) ("[t]o guarantee that RICO will be utilized against its intended target, the 'enterprise' alleged must involve more than an association of criminals for the commission of sporadic crime").

*Id.* at 240–41 (reserving until trial proof that at least 15 different illegal acts committed over a seven-month period were more than "sporadic crime").

The third characteristic, distinct structure, has required the most clarification:

> Th[e] distinct structure might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of

this type of structure as is the hierarchy, planning, and division of profits within a prostitution ring.

*Diamonds Plus, Inc.,* 960 F.2d at 770 (quoting *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.), *cert. denied sub nom. Phillips v. United States,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982)). Thus, the "focus of the inquiry" on this characteristic is "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." *Id.* In conducting this inquiry, the court may consider the facts used to support the showing of predicate offenses. *Id.* (citing *United States v. Leisure,* 844 F.2d 1347, 1363 (8th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988)). A "complicated organizational pattern" involving staffing of an office to respond to inquiries from "customers," and disguising of who made operational decisions by presenting one person to the public as being in charge, while behind the scenes another person actually made the key decisions, is one way of showing this characteristic. *Id.* However, it is "not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity," *id.* (quoting *United States v. Kragness,* 830 F.2d 842, 857 (8th Cir.1987), in turn quoting *United States v. Riccobene,* 709 F.2d 214, 223–24 (3d Cir.), *cert. denied sub nom. Ciacaglini v. United States,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)), nor is it necessary that there be "some proof of lawful activity on the part of the enterprise." *Id.* (citing *United States v. Lemm,* 680 F.2d 1193, 1197–98 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983)). However, the enterprise must be more than "an instance of a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes." *Id.* (quoting *Lemm,* 680 F.2d at 1201).

The court has considered the requirements of this element of a § 1962(c) offense only for the purpose of demonstrating the interplay of the elements. Defendants do not assert that Morken's enterprise was not a RICO enterprise. They argue that, even if Morken's enterprise was a RICO enterprise, and they assert that it was certainly a means of con-

ducting criminal activity or wrongful activity, they did not conduct that enterprise through a pattern of racketeering activity. The court concluded above that defendants did not conduct Morken's enterprise. Assuming, *arguendo*, that they did conduct the enterprise, the question becomes whether or not they did so through a pattern of racketeering activity. The court concludes that this question, like the one regarding the first element of a § 1962(c) violation, must ultimately be answered in the negative. This final question concerning RICO liability is in two parts: was there an allegation of a pattern of activity, and was that activity racketeering activity?

### c. *"Through a pattern ..."*

Liability under RICO is premised upon conduct involving a "pattern" of racketeering activity. 18 U.S.C. § 1962; *Manion,* 967 F.2d at 1185. Allegation of a "pattern of racketeering" has been described as "the heart of any RICO complaint." *Agency Holding Corp. v. Malley–Duff & Assoc.,* 483 U.S. 143, 154, 107 S.Ct. 2759, 2766, 97 L.Ed.2d 121 (1987); *Granite Falls Bank v. Henrikson,* 924 F.2d 150, 154 (8th Cir.1991) (quoting *Malley–Duff*). This pattern requirement is the primary source of RICO's unique character. *Granite Falls Bank,* 924 F.2d at 153. The Act defines a "pattern" as requiring at least two acts of racketeering or predicate acts. 18 U.S.C. § 1961(5); *Manion,* 967 F.2d at 1185; *Diamonds Plus, Inc.,* 960 F.2d at 769. The Eighth Circuit Court of Appeals has noted that

> In *H.J. Inc.,* the Supreme Court held that, by the term "pattern," Congress intended to require that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239, 109 S.Ct. at 2900 (emphasis in original). Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 *citing* 18 U.S.C. § 3575(e). Continuity

> requires proof of "related predicates extending over a substantial period of time" or "involving a specific threat of repetition extending indefinitely into the future." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902 (proof that predicate acts are "part of an ongoing entity's regular way of doing business").

*Manion,* 967 F.2d at 1185–86; *Terry A. Lambert Plumbing,* 934 F.2d at 979 (relatedness and continuity of acts is required by the legislative history, citing *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900).

The "at least two acts of racketeering activity" requirement in 18 U.S.C. § 1961(5) "is only a minimum requirement." *Diamonds Plus, Inc.,* 960 F.2d at 769 (citing *H.J. Inc.,* 492 U.S. at 238, 109 S.Ct. at 2900). The requirements that the acts be related and pose a threat of continued criminal activity are also essential. *Id.* After defining relatedness and continuity as above, *id.* (citing *First National Bank & Trust Co. v. Hollingsworth,* 931 F.2d 1295, 1304 (8th Cir. 1991), which defines the relationship between the acts as "similar in method, purpose, and result," and *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03, which defines continuity as demonstrated by "a series of related predicates extending over a substantial period of time" or a showing that the "acts or offenses are part of an ongoing entity's regular way of doing business"), the court noted that "[u]ltimately, the existence of a pattern is a question of fact." *Id.* (citing *Terry A. Lambert Plumbing,* 934 F.2d at 980). The requirements for demonstrating a pattern of RICO activity were met, for example, where

> [t]here was evidence that in an approximately two year span, between 125 and 350 people flew to Houston to meet with [defendants in response to advertisements in national newspapers]—and paid one thousand dollars each for [defendants'] "services"—yet none of these people were provided with financing. The district court's conclusion that this constituted a "pattern of racketeering activity" is clearly correct and does not remotely approach being clearly erroneous.

*Id.*

The continuity requirement involves the court's examination of the length of time

during which the conduct occurred. *Terry A. Lambert Plumbing,* 934 F.2d at 980; *Atlas Pile Driving Co.,* 886 F.2d at 994. The Eighth Circuit Court of Appeals has declined to determine what period of time is needed to establish continuity. *Terry A. Lambert Plumbing,* 934 F.2d at 980. Instead, the court has held that a period of "over three years" was sufficient, *Atlas Pile Driving Co.,* 886 F.2d at 994, but a single transaction, with only one victim, taking place over a short period of time does not constitute a "pattern of racketeering" sufficient to sustain a RICO claim. *Terry A. Lambert Plumbing,* 934 F.2d at 981. However, the Eighth Circuit Court of Appeals allowed a criminal RICO prosecution to go to trial on allegations of 15 different illegal acts within only a seven-month period, finding that the government would bear the burden of demonstrating that these acts constituted more than "sporadic crime." *Nabors,* 45 F.3d at 241.

▮ Defendants argue strenuously that plaintiffs have alleged predicate acts spanning only a ten month period, *see* Complaint, ¶ 44 ("From September 1, 1993 through at least June 3, 1994"), and that this period is insufficient as a matter of law, citing *Primary Care Inv., Seven, Inc. v. PHP Healthcare Corp.,* 986 F.2d 1208, 1215–16 (8th Cir. 1993). In *Primary Care,* the Eighth Circuit Court of Appeals wrote:

No Eighth Circuit case has set a minimum period of time over which the predicate acts must extend in order to be "substantial." Other Circuits have consistently held that the requirement of continuity over a closed period is not met when the predicate acts extend less than a year. *See, e.g., Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 922 (7th Cir.1992) (seven to eight months insufficient); *Aldridge v. Lily–Tulip, Inc. Salary Retirement Plan Benefits Committee,* 953 F.2d 587, 593 (11th Cir.) (six months to a year insuf-

ficient), *rehearing denied,* 961 F.2d 224 (11th Cir.1992); *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 609–11 (3rd Cir.1991) ("twelve months is not a substantial period of time"), *cert. denied,* 504 U.S. 955, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992); *American Eagle Credit Corp. v. Gaskins,* 920 F.2d 352, 354–355 (6th Cir.1990) (six months insufficient). Many cases in which courts have found a "substantial period of time" have involved schemes extending for a number of years. *See, e.g., Dana Corp. v. Blue Cross & Blue Shield Mut. of Ohio,* 900 F.2d 882, 887 (6th Cir.1990) (17 years); *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 447 (1st Cir.1990) (four and a half years); *Walk v. Baltimore and Ohio R.R.,* 890 F.2d 688, 690 (4th Cir.1989) (ten years). In this case, the activity lasted between ten and eleven months and, in light of the growing body of case law that we have just reviewed, we deem this period insubstantial. Accordingly, plaintiffs did not prove the continuity requirement necessary for their RICO claim to survive summary judgment.

*Id.* at 1215–16. This decision, however, must be contrasted with the more recent decision in *Nabors,* in which the Eighth Circuit Court of Appeals refused to dismiss a RICO criminal claim on the ground that the seven month period alleged could be shown at trial to involve sufficiently continuous criminal activity to be more than "sporadic crime." *Nabors,* 45 F.3d at 241. Because the court finds that there is no settled rule making the ten month period alleged insufficient as a matter of law, and because it finds other matters dispositive of the sufficiency of the RICO claim, this court will not decide what the Eighth Circuit Court of Appeals has consistently refused to decide, what time frame for predicate acts is sufficient as a matter of law to support a RICO claim. *Primary Care,* 986 F.2d at 1215; *Terry A. Lambert Plumbing,* 934 F.2d at 980.[16]

---

**16.** The court is persuaded, on the basis of *Nabors* and the analysis of the court in *Primary Care,* in which the court conducted a careful analysis of the relationship among the acts that could constitute predicate acts to reduce the relevant period from the 21 months alleged down to ten, *Primary Care,* 986 F.2d at 1214–1215, that continuity should not be considered completely indepen-

dently of relatedness. A sufficiently related set of acts lasting several months, but less than a year, might well meet the dual requirements of the "pattern of activity" element of a RICO claim. The court also sees little value in a rule of thumb that gives permission to sufficiently perspicacious wrongdoers to set up and close down a

■ What the court finds to be fatal to the RICO allegations here is the absence of a factual allegations identifying with sufficient specificity any predicate acts such that the court can determine in what way they may or may not be related. The bald allegations of wire and mail fraud do not identify the acts, actors, or victims sufficiently for the court to determine whether or not they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; *Manion,* 967 F.2d at 1185–86. Asserting that some group of victims, without identifying who the specific members are or of what acts each was a victim, was subjected to unidentified deceptive acts by use of the mails and wires by unidentified actors at unspecified times within a period of several months is inadequate as a matter of law to demonstrate or to allege a RICO "pattern."

### d. "Of racketeering activity …"

■ As the court mentioned above, RICO "imposes criminal and civil liability upon those who engage in certain 'prohibited activities.'" *Manion,* 967 F.2d at 1185 (quoting *H.J. Inc.,* 492 U.S. at 232, 109 S.Ct. at 2897). These racketeering activities are listed in 18 U.S.C. § 1961, and include certain specified state law and federal crimes. *Diamonds Plus, Inc.,* 960 F.2d at 768. Some state law crimes are not in this list, and therefore cannot constitute RICO predicate acts, *Manion,* 967 F.2d at 1186 (breach of fiduciary duty is not one of the specified state crimes listed in the definition of "racketeering activi-

ty," 18 U.S.C. § 1961(1), and thus could not support a civil RICO claim), nor can commonly accepted business practices, regardless of the use made of them. *Terry A. Lambert Plumbing,* 934 F.2d at 981 (commonly accepted banking practices cannot be characterized as racketeering, and foreclosing on problem loans is not a criminal act).

■ Where the plaintiff fails to demonstrate both the requisite predicate acts and the requisite relatedness of those acts, the court can properly dismiss the racketeering claims. *Information Exchange Sys., Inc. v. First Bank Nat'l Ass'n,* 994 F.2d 478, 485 (8th Cir.1993). Thus, in *Information Exchange,* the trial court properly dismissed the plaintiffs' RICO claim based on insufficient allegations of the acts of mail and wire fraud. *Id.* Similarly, in *Manion,* the court concluded that because plaintiff had failed "to show that he could establish the predicates acts of mail or wire fraud, [plaintiff also] could not establish an essential element of a civil RICO violation—a pattern of racketeering activity," and defendants were entitled to judgment as a matter of law. *Manion,* 967 F.2d at 1186.

■ *i. Mail and wire fraud.* Because the plaintiffs here have alleged predicate acts including mail and wire fraud, decisions considering RICO claims founded upon such predicate acts are instructive. "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Diamonds Plus, Inc.,* 960 F.2d at 768 (quoting *Atlas Pile Driving Co.,* 886 F.2d at 991).[17]

fraudulent scheme within a year to avoid RICO liability.

17. The complaint contains three allegations of wire or mail fraud "predicate acts," which are as follows:

44. The pattern of racketeering activity consisted of the following:
a. Morken had been engaged in the practice of issuing checks, through the mails in interstate commerce, to various persons who received the checks for value, in good faith, and the ordinary course of business, although there were not "good" or "collected" funds in the accounts to honor these checks. Firstar was fully aware of this practice and actively participated and controlled the prac-

tice; or, it aided and abetted the practice by transferring sufficient funds to the accounts upon which the Morken checks were written by means of its controlled disbursement services. As operated, the scheme constituted Mail Fraud in violation of 18 U.S.C. § 1341 and Wire Fraud in violation of 18 U.S.C. § 1343. Firstar is liable as a principal for these offense; or, as a conspirator under 18 U.S.C. § 371; or as an aider and abettor under 18 U.S.C. § 2(a). Firstar's involvement in the scheme therefore constituted a racketeering activity under 18 U.S.C. § 1961(1)(D).
* * *
c. After having privately decided in April of 1994 to "collapse the float" and to discontin-

In a few cases, the Eighth Circuit Court of appeals has considered the necessary allegations of wire and mail fraud to sustain such claims as RICO predicates acts. In *Information Exchange Sys.,* the court concluded that plaintiffs had failed adequately to allege the elements of a wire or mail fraud predicate act because plaintiffs "cite[d] no specific evidence ... of motive for ... a scheme [to take over plaintiffs' businesses through use of the mails and telephones], particular communications, how those communications were fraudulent, or how those communications furthered the alleged scheme." *Information Exchange Sys.,* 994 F.2d at 485. In *Manion,* the Eighth Circuit Court of Appeals concluded that:

> [plaintiff] identified numerous communications by mail or telephone, but failed to allege a scheme to defraud or to specify in what respect the communications were fraudulent or how they were used in furtherance of the scheme to defraud. Mail or wire fraud requires proof of a scheme to defraud and use of the mails or wires in furtherance of that scheme. *E.g., United States [v. Leyden],* 842 F.2d 1026, 1028 (8th Cir.1988) (foreseeable use of mails by defendant or others).

*Manion,* 967 F.2d at 1186. Furthermore, a showing of intent to defraud is critical:

> No single fact need demonstrate the defendant's intent; rather, intent to defraud can be discerned by examining the totality of the circumstances surrounding the defendant's activities. [*Atlas Pile Driving Co.,* 886 F.2d at 991.] Intent to defraud need not be evinced by the defendant's avowed intent to bilk members of the public; it can also be demonstrated when the defendant recklessly disregards whether his representations are true. *E.g., United States v. Henderson,* 446 F.2d 960, 966 (8th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

*Diamonds Plus, Inc.,* 960 F.2d at 768. In *Diamonds Plus,* the court found sufficient support for a mail fraud predicate act to a RICO claim based on advertisement in two national newspapers in evidence that the defendant "recklessly disregarded the truth of his advertisements' representations and thereby acted with intent to defraud." *Id.* at 768–69.

In *Utesch v. Dittmer,* 947 F.2d 321 (8th Cir.1991), *cert. denied,* 503 U.S. 1006, 112 S.Ct. 1764, 118 L.Ed.2d 425 (1992), the court concluded that the plaintiff's failure to show any fraudulent act in violation of the mail and wire fraud statute, 18 U.S.C. §§ 1341, 1343, meant that he had also failed to support his RICO claim. *Id.* at 329. The plaintiff's RICO claim alleged violation of 18 U.S.C. § 1962(c) on the ground that

> defendants "used the mails and telephone" (1) to buy short positions in the October 1979 live cattle contracts under which large deliveries were later tendered at artificial prices; (2) to induce others, through fraudulent and deceptive statements and representations, to purchase large long positions in the October 1979 and December 1979 live cattle contracts; and (3) to communicate and conspire with their co-conspirators in furtherance of the alleged unlawful acts.

*Id.* The evidence relied on in support of these claims was to the effect that one defendant's public expressions of opinion, to the effect that the live cattle futures market would go up, was contrary to what he actually believed. *Id.* However, such an expression of opinion was insufficient to amount to fraud when there was no evidence that the defendant knew when the statement was made that it was false. *Id.* at 328.

The court concludes that it does not "appear[ ] beyond doubt that [plaintiffs] can prove no set of facts" in support of the element of intent to defraud, *Carney,* 33 F.3d at 894 (standards for dismissal pursuant to

---

ue the line of credit that had been granted to Morken through its controlled disbursement services, Firstar nevertheless continued to fund the Morken accounts while setting up a strategy designed to minimize its expected losses at the expense of innocent persons who had dealt with Morken in good faith and who were completely unaware of the true overdrawn condition of Morken's bank accounts. This constituted a scheme by Firstar to obtain funds through fraud or deceit and by use of interstate mails and wires, and is therefore a racketeering activity under 18 U.S.C. § 1961(1)(D).

Rule 12(b)(6)), based on their claim that defendants expressed opinions that Morken and SGLE were financially strong when they knew that such a statement was false, because if assertions were made by one or more of the defendants that Morken was financially strong when that defendant knew of the actual financial condition of Morken's enterprises, plaintiffs would have shown intent to defraud. However, intent to defraud is but one of the elements of wire or mail fraud and conclusory allegations, such as those found in the complaint, are insufficient to allege fraud.

Although the decision of the Eighth Circuit Court of Appeals in *Information Exchange Sys.*, identifies, at least by reference, the elements of a mail or wire fraud scheme, 994 F.2d at 485 ("a scheme [to defraud using the mails and telephones], particular communications, how those communications were fraudulent, [and] how those communications furthered the alleged scheme"), this court finds decisions from other circuit courts of appeals more directly on point on the question of the adequacy of a pleading of a mail or wire fraud predicate act.

In *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir.1994), the Seventh Circuit Court of Appeals found plaintiffs' amended complaint "to be wanting in critical respects" in its allegations of mail and wire fraud. *Id.* at 1327. The court concluded that the heightened standard for pleading of fraud found in *Fed.R.Civ.P.* 9(b) "[o]f course ... applies to allegations of mail and wire fraud and by extension to RICO claims that rest on predicate acts of mail and wire fraud." *Id.* (citing *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 352 (7th Cir.1992); *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 992–93 (7th Cir.1991)). The court also noted that the purpose of Rule 9(b) was "(1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party." *Id.* (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994)). Thus, the court concluded,

"loose references to mailings and telephone calls" in furtherance of a purported scheme to defraud will not do. *R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1516 (N.D.Ill.1990). Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications. *Schiffels*, 978 F.2d at 352–53; *Midwest Grinding*, 976 F.2d at 1020; *Uni\*Quality*, 974 F.2d at 923–24; *U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268 n. 6 (7th Cir.1990); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993); *R.E. Davis*, 757 F.Supp. at 1516. These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim. For "[w]ithout an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established." *R.E. Davis*, 757 F.Supp. at 1516. The complaint must also allege facts from which it reasonably may be inferred that the defendants engaged in the scheme with fraudulent intent, *McDonald v. Schencker*, 18 F.3d 491, 495 (7th Cir.1994); *Graue Mill*, 927 F.2d at 992. Moreover, when the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud. *Vicom*, 20 F.3d at 778.

*Id.* at 1328. Similar standards are stated by other courts of appeals. *See, e.g., Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 865 (1st Cir.1993) (mail or wire fraud predicate act for RICO must be pleaded with particularity, but burden of Rule 9(b) is alleviated somewhat by allowing general averments of state of necessary mind, and where information is peculiarly within the defendants' hands); *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir.1992) (Rule 9(b) requirements apply to allegation of mail or wire fraud RICO predicate, citing *Landry v. Air Line Pilots Ass'n Int'l AFL–CIO*, 901 F.2d 404, 430 (5th Cir.),

*cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990)); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir.1987) (RICO plaintiff asserting wire or mail fraud "must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud," but allowing some discovery before requiring specificity of pleading mail or wire fraud predicate acts for RICO claim); *Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir.1986) (to allege mail or wire fraud predicates for RICO claims, plaintiff must state the time, place, and specific content of the false representations as well as the identities of the parties to the representations as required by Rule 9(b)).

In *Jepson, Inc.*, the court found the deficiencies in the complaint to include (1) only general identification of the nature of the purported misrepresentations, and (2) allegations of "multiple instances" of use of the wires and mails to contact customers, but failure to identify which customers were contacted when. *Jepson, Inc.*, 34 F.3d at 1328. Although the court accepted that the specificity requirements "may be relaxed ... when details are within the defendant's exclusive knowledge," the court concluded that such was not entirely the case in the circumstances before it, because plaintiffs learned of the communications from the customers themselves. *Id.* The court concluded that the plaintiffs could not complain of inability to obtain the necessary information, because they had as much access to the customers as did the defendants. *Id.*

The complaint in this case is startlingly similar to that in *Jepson* in its deficiencies and the ability of plaintiffs to obtain the necessary information from among their members to flesh out the circumstances of the communications alleged to constitute mail or wire fraud, at least as to the first mail fraud allegation. As in *Jepson*, the complaint makes only general identification of the nature of the purported misrepresentations, and although it contains allegations of "multiple instances" of use of the wires and mails to contact customers, it fails to identify which plaintiffs or other parties were contacted when. The complaint alleges that

Morken, not any of the named defendants, issued checks, without identifying any of them, through the mails in interstate commerce, to various unidentified persons who received the checks for value, in good faith, and the ordinary course of business, although there were not "good" or "collected" funds in the accounts to honor these checks. Although the complaint alleges generally that Firstar was fully aware of this practice and actively participated and controlled it, or aided and abetted it, it does not identify which Firstar subsidiary or other defendant had such knowledge and participated in the scheme. Thus, the allegations of mail and wire fraud here also fail *Jepson's* requirement that "when the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud." *Id.*

As to the second mail or wire fraud allegation, the complaint fails to identify any factual basis for the allegation that defendants had a strategy designed to minimize its expected losses at the expense of innocent persons who had dealt with Morken and who were unaware of the overdrawn condition of Morken's bank accounts. There is simply no pleading of the time, place and content of the alleged mail and wire communications perpetrating this alleged fraud. It is possible that permitting further discovery on this fraud allegation might allow plaintiffs to meet the proper pleading standards, and the court is more inclined to conclude that the necessary information to support this fraud allegation may be solely in the hands of the defendants than was information concerning the first fraud allegation. However, because the court has concluded that the complaint is inadequate in its pleading of other elements of a RICO violation pertaining to this alleged predicate act, the court does not believe that merely permitting discovery on this fraud allegation will cure the pleading defects sufficiently to salvage the RICO claim.

Consequently, the court concludes that plaintiff has failed to plead predicate acts of mail or wire fraud with the requisite specificity. A generous reading of the complaint would find the pleadings adequate only as to

**974**

intent to defraud and, perhaps, the manner in which the communications were fraudulent and furthered a scheme to defraud. However, they are wholly lacking in the requisite details of time, place, and content of the alleged mail and wire communications perpetrating these alleged frauds. Therefore, the RICO claims founded on predicate acts of mail or wire fraud should be dismissed for failure to plead such predicate acts sufficiently.

*ii. Securities fraud.* Next, plaintiffs have attempted to allege securities fraud as RICO predicate acts.[18] Securities fraud is identified as a RICO predicate act in 18 U.S.C. § 1961. However, for reasons discussed in relation to defendants' motion to dismiss Counts I and II alleging securities laws violations, the court concludes that plaintiffs have not and cannot allege the elements of securities fraud necessary to sustain such fraud as RICO predicate acts. Plaintiffs have therefore also failed to allege racketeering activity in the form of securities fraud.

18. Plaintiff's allegations of securities fraud are as follows:

> b. From September 1, 1993 through at least June 3, 1994, Firstar attempted to mitigate its unsecured exposure in the line of credit it had extended to Morken through its controlled disbursement services by encouraging expansion of the Adventure Cattle program and by directing the flow of Adventure Cattle funds to the SGLE lock box account. The investor funds, both from the sale of the feeder cattle to investors and from the sale of the fattened cattle to packers, deposited to the SGLE account represented collected funds that operated to reduce the overdraft condition of the accounts. The expansion of the Adventure Cattle program and Firstar's participation therein, while concealing Morken's true financial condition from the Adventure Cattle investors, constituted fraud in connection with the sale of securities and, therefore, a racketeering activity under 18 U.S.C. § 1961(a)(D).

Complaint, ¶ 44(b).

19. The bankruptcy fraud allegation in the Complaint is as follows:

> d. After stopping payment on checks issued by Morken to various persons in the ordinary course of business, and as part of the strategy that it had adopted, Firstar caused various affidavits and pleadings to be filed in connection with the Morken and SGLE bankruptcy proceedings that purported to

*iii. Bankruptcy fraud.* Plaintiffs' final allegation of a RICO predicate act asserts bankruptcy fraud.[19] Defendants assert, first, that the allegedly fraudulent statements attributed to them in the complaint are actually to be found in the pleadings of another party in the bankruptcy proceedings. Next, they assert that the "bankruptcy fraud" allegation is inadequately pleaded, and, further, demonstrates no harm to plaintiffs because the truth of any statements made by defendants in connection with the Morken and SGLE bankruptcies can be litigated in those proceedings. Defendants assert that the availability of litigation in the bankruptcy proceedings forecloses a RICO claim. Plaintiffs respond that defendants appended the purportedly fraudulent statements of another to their own joinder in a motion for appointment of a chapter 11 trustee, thus making them liable for the fraud. Next, plaintiffs argue that defendants are taking inconsistent positions, asserting in this litigation that the allegations of bankruptcy fraud can be pur-

> portray Firstar as a "victim" of a "massive check kiting fraud," and further stated that Firstar had just recently discovered the supposed check kiting scheme. Firstar had always been aware of Morken's banking practices since their inception and had, in fact, participated with Morken in establishing and conducting those practices through its controlled disbursement services, and nonetheless attempted to characterize itself as a victim of a kiting scheme when it had, in fact, established and operated the scheme along with Morken for its own profit. Firstar had also been aware, at all relevant times, of the many large and recurring checks written on the SGLE accounts for deposit to Morken's individual accounts, of checks drawn on the Morken individual accounts for deposit to the SGLE accounts, and of the purpose in making those checks and deposits. Firstar's purpose in falsely characterizing the situation in the Morken accounts to others was to establish control over Morken's enterprise, and to enhance its position and status as a creditor in the Morken/SGLE bankruptcies at the expense of innocent victims of its "controlled disbursement" scheme, and its scheme following its decision to terminate Morken's float line of credit therefore constitutes a fraud in connection with a case under title 11 of the United States Code, and, therefore, a racketeering activity under 18 U.S.C. § 1961(1)(D).

Complaint, ¶ 44(d).

sued in the bankruptcy proceedings, but obtaining an order in bankruptcy court abandoning the Adventure Cattle assets, then arguing that the bankruptcy trustees are indispensable parties in the present litigation.

RICO section § 1961 lists the predicate acts for a RICO claim as including any "offense involving fraud connected with a case under title 11." 18 U.S.C. § 1961. Unlike the other allegations of fraud in the complaint, the allegation of bankruptcy fraud specifically identifies the maker of the statements,[20] to whom they were made—the bankruptcy court and the parties to the bankruptcy—and the respect in which the statements are alleged to be fraudulent—defendants characterization of themselves as the victims of Morken's check-kiting scheme despite the fact that they allegedly always knew of Morken's practices. It does not, however, provide any pleading of specific facts, only conclusory allegations, in support of the claim that defendants "always knew" of Morken's check-writing scheme, or helped establish and operate it. Again, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P.* 9(b). These requirements have not been met as to the allegations of this predicate act. Admittedly, evidence of what the defendants knew and when they knew it may be peculiarly within the knowledge of the defendants, and thus discovery on this issue might be appropriate, but for other difficulties.

■ However, an isolated, unrelated predicate act of bankruptcy fraud cannot establish a pattern of racketeering activity to make out a RICO violation. *See Pelletier v. Zweifel,* 921 F.2d 1465, 1516 n. 90 (11th Cir.), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991), and discussion of the "pattern" requirement in section III.A.1.c. above, beginning on page 968. The bankruptcy fraud must be related to another predicate act in order to establish the pattern

requirement for RICO liability. *Id.* There are no other allegations of predicate acts sufficiently pleaded in the complaint. Thus, there are no other predicate acts to which the bankruptcy fraud allegation could be added to demonstrate a pattern of racketeering activity.[21] The bankruptcy fraud claim alone, even if it is adequately pleaded or could be so pleaded after discovery, cannot sustain a RICO claim alone. Therefore, defendants are entitled to dismissal of the RICO count of plaintiffs' complaint.

### D. Securities Laws Violations

Counts II and III of the amended complaint allege violations of the Securities Acts of 1933 and 1934. The Count II asserts that "Firstar" was a "seller," along with Morken, of unregistered securities in the form of Adventure Cattle investment contracts in violation of §§ 5 and 12(1) of the 1933 Act. Count III alleges violation of § 12(2) of the 1933 Act, and § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, asserting that "Firstar" and Morken issued the Adventure Cattle contracts in violation of the securities acts, because they "failed to disclose material facts to purchasers in connection with the sale and issuance" of the contracts, thereby violating the cited provisions. This Count also alleges that "Firstar" engaged in deceptive practices in support of the investment scheme, and, thus, was a joint venturer, "controlling person," or "underwriter" in the Adventure Cattle program.

Defendants assert that plaintiffs' securities claims must fail because the cattle contracts at issue are not "securities," and therefore there can be no violation of the securities laws in the manner alleged. Even if the contracts were securities, defendants argue that they were not "sellers" of those securities, nor joint venturers, "controlling persons," or "underwriters" of the investment scheme. Plaintiffs contend that the cattle contracts in question here are indeed securi-

---

**20.** Defendants' adoption of the statements in question in their own joinder in the motion before the bankruptcy court appears to this court sufficient, at least at this stage of the proceedings, to attribute the statements to these defendants.

**21.** This assumes that the "relatedness" requirement among the predicate acts could be shown.

ties, and that defendants were indeed sellers of those securities. Furthermore, plaintiffs assert that the complaint sufficiently alleges both defendants' duty to make disclosures and their failure to do so in this case. The court therefore turns next to the questions of whether or not the Adventure Cattle contracts involved in this litigation are "securities," and whether defendants were "sellers" of those securities.

Section 27 of the Securities Exchange Act gives federal district courts exclusive jurisdiction over claims arising under that Act. *See* 15 U.S.C. § 78aa; *Riley v. Simmons*, 45 F.3d 764, 772 (3d Cir.1995). Section 5 of the Securities Act requires a seller of securities to file a registration statement before offering a security for sale unless the securities offered come within statutorily defined exemptions.[22] 15 U.S.C. § 77e; *Riley*, 45 F.3d at 774. Section 12(1) provides that a purchaser of a security that is not registered in accord with § 5 has a civil action for damages against a seller of the security. 15 U.S.C. § 77*l* (1); *Riley*, 45 F.3d at 774. Section 12(2) provides generally that any person who mails a prospectus with untrue material statements or material omissions is liable to "the person purchasing such security from him."[23] 15 U.S.C. § 77*l* (2); *7547 Corporation v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 225 (5th Cir.1994). Section 10(b) and Rule 10b–5 promulgated thereunder also prohibit material omissions or misrepresentations by sellers of securities in other circumstances. 15 U.S.C. § 78j(b).[24]

**22.** Section 5, 15 U.S.C. § 77e, provides, in pertinent part, as follows:

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

**23.** The provision of § 12 are codified at 15 U.S.C. § 77*l*, and are as follows:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

**24.** The provisions of Section 10(b) are as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulation or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

There are substantial differences between the elements of the plaintiff's case under § 10 and Rule 10b–5 of the Securities Exchange Act of 1934 and under § 12(2) of the Securities Act of 1933. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 380–86, 103 S.Ct. 683, 686–90, 74 L.Ed.2d 548 (1983); *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 368 n. 10 (3rd Cir.1993) (hereinafter *"Trump "*), *cert. denied sub nom. Gollomp v. Trump*, —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

Under the former, the plaintiffs must plead not only that the defendants made material omissions and/or misrepresentations, but also that they reasonably relied on them and that the defendants acted with knowledge or recklessness.... In contrast, ... § 12(2) impose[s] no such requirements.

*Trump*, 7 F.3d at 368 n. 10 (internal citations omitted).

Thus, each imposes liability only on "sellers" of "securities" or closely related individuals.[25] The court must therefore consider, first, whether the Adventure Cattle contracts were "securities," and then whether defendants were "sellers" of those securities.

### 1. The Definition Of "Securities"

■ The threshold question presented by any claim of violation of securities laws is "whether what the plaintiffs invested in was actually a 'security.'" *Stone v. Kirk,* 8 F.3d 1079, 1084 (6th Cir.1993) (citing *Union Planters Nat'l Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1179 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) ("The threshold question in any action brought pursuant to the Securities Acts is whether a security exists.")); *Koch v. Hankins,* 928 F.2d 1471, 1475 (9th Cir.1991) ("critical threshold inquiry" was whether investments were "investment contracts" within meaning of Act and therefore subject to securities regulation). Courts have recognized that applying the legislative definition of "security" in the federal securities regulations is a "difficult task." *Pollack v. Laidlaw Holdings, Inc.,* 27 F.3d 808, 811 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 425, 130 L.Ed.2d 339 (1994).

The definition of a "security" for the purposes of federal securities regulations is found in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and in § 3(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). *Teague v. Bakker,* 35 F.3d 978, 986 (4th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1107, 130 L.Ed.2d 1073 (1995); *SEC v. Eurobond Exchange, Ltd.,* 13 F.3d 1334, 1338 (9th Cir.1994); *Stone,* 8 F.3d at 1084–85 (discussing only § 78c(a)(10)); *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1537 (10th Cir.1993) (hereinafter

"RTC") (discussing only § 77b(1)); *Holden v. Hagopian,* 978 F.2d 1115, 1118 (9th Cir. 1992). These two sections differ only slightly in wording and have generally been considered by the courts to be indistinguishable in interpretation. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985); *Teague,* 35 F.3d at 986 n. 6; *Pollack,* 27 F.3d at 811; *Holden,* 978 F.2d at 1118 (term is defined "similarly" in the two acts). Both sections include within their definition of securities "investment contracts." 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10). The parties here agree that if the Adventure Cattle investment contracts are securities, they are "investment contract" securities. The purpose of the inclusion of "investment contracts" within the definition of securities was to identify unconventional instruments that have the essential properties of a debt or equity security. *Landreth,* 471 U.S. at 690, 105 S.Ct. at 2304; *Wals,* 24 F.3d at 1018.

### 2. "Investment Contracts" And The Howey Test

■ Almost fifty years ago, the United States Supreme Court established the test of what investment vehicles fall within the definition of an "investment contract" as a security subject to regulation under federal securities regulations in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946).[26] *Teague,* 35 F.3d at 986; *Eurobond Exchange,* 13 F.3d at 1338; *Stone,* 8 F.3d at 1085; *Holden,* 978 F.2d at 1119. Under the *Howey* test, an investment contract security exists if the contract involves (1) an investment of money (2) in a common enterprise (3) with an expectation of profits garnered "solely" from the efforts of others. *Howey,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03 (an "investment con-

---

**25.** Courts have also held that liability under § 12 of the Securities Act of 1933 also applies only to initial offerings and not after market trading. *First Union Discount Brokerage Servs., Inc. v. Milos,* 997 F.2d 835, 843 (11th Cir.1993); *but see Pacific Dunlop Holdings, Inc. v. Allen & Co., Inc.,* 993 F.2d 578, 595 (7th Cir.1993) (§ 12(2) applies to both initial offerings and secondary market transactions), *cert. denied,* — U.S. —, 114 S.Ct. 907, 127 L.Ed.2d 98 (1994).

**26.** In contrast to this long-standing test of what is an "investment contract," the Supreme Court only recently reformulated the test of what is a "note" under the definitions of securities in the case of a "mortgage participation," using a "family resemblance" test. *Reves v. Ernst & Young,* 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990).

tract" includes any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party"); *Teague,* 35 F.3d at 986; *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (2d Cir.1994); *Eurobond Exchange,* 13 F.3d at 1338; *Stone,* 8 F.3d at 1085; *RTC,* 998 F.2d at 1540. The test is a flexible one, "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103; *Stone,* 8 F.3d at 1085 (quoting *Howey* ); *Securities and Exchange Comm'n v. R.G. Reynolds Enter., Inc.,* 952 F.2d 1125, 1130 (9th Cir.1991). Furthermore, in defining securities, substance governs form, and the substance of an investment contract is a security-like interest in a "common enterprise" that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment. *Howey,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03; *United Housing Found. v. Forman,* 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975); *Rodriguez v. Banco Cent. Corp.,* 990 F.2d 7, 10 (1st Cir.1993) (holding that land sales contracts were not securities, because they involved no investment in an enterprise, even if land was bought on expectation that development of the area would increase the value of the land).

### a. Investment of money

Courts rarely tarry over the "investment of money" prong of the *Howey* test. *See, e.g., Eurobond Exchange,* 13 F.3d at 1338 ("It is undisputed that there is an investment of money: 'At least 26 Americans invested over $1.6 million in defendants' program.' SEC Brief at 19. Thus, the first element is met."). In this case, it is undisputed that at least dozens of investors invested millions of dollars in Adventure Cattle. Thus, the first element is met.

### b. Common enterprise

The common enterprise prong of the *Howey* test has caused courts to examine both "vertical" commonality and "horizontal" commonality, coming to various conclusions about which kind of commonality is required. *See Wals v. Fox Hills Development Corp.,* 24 F.3d 1016, 1017–18 (7th Cir.1994) (identifying the split in the circuits over whether "vertical" or "horizontal" commonality is required for an "investment contract" under *Howey,* and identifying *Miller v. Central Chinchilla Group, Inc.,* 494 F.2d 414, 418 (8th Cir.1974), as holding that only vertical commonality is required); *Revak,* 18 F.3d at 87 (also identifying cases requiring only vertical commonality, defined as "focus[ing] on the relationship between the promoter and the body of investors," in contrast to its conclusion that horizontal commonality is required).

It is not clear whether a trend toward requiring one or the other form of commonality is apparent, and the Supreme Court has not decided the issue. *Wals,* 24 F.3d at 1018. Because there is no recent Eighth Circuit decision to resolve this split which has become more apparent over the last two decades, the court will examine the requirements of both vertical and horizontal commonality.

As a general guide, "vertical commonality" requires only a pooling of the interests of the developer or promoter and each individual investor, while "horizontal commonality" requires as well a pooling of interests among the investors, described by the court in *Wals* as "a wheel and not just a hub and a spoke." *Wals,* 24 F.3d at 1018. The horizontal commonality requirement has caused courts to see if the investor, like a purchaser of a share of stock, has an "undivided interest in an enterprise, entitling the owner to a pro rata share in the enterprise's profits." *Wals,* 24 F.3d at 1018 (citing *Forman,* 421 U.S. at 851, 95 S.Ct. at 2060). For example,

> [t]he owner of a condominium does not own an undivided share of the building complex in which his condominium is located. He owns his condominium, and if it is rented out for him by the developer he receives the particular rental on that unit rather than an undivided share of the total rentals of all the units that are rented out. The nature of his interest thus is different

from that of a shareholder in a corporation that owns rental property.

*Id.* Similarly, a pooling of the profits is an essential element of horizontal commonality. *Id.; see also Revak,* 18 F.3d at 87 ("A common enterprise within the meaning of *Howey* can be established by a showing of "horizontal commonality": the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits," citing cases). Although noting that the Supreme Court has never adopted the "horizontal commonality" requirement as essential to a showing of a common enterprise, but finding it sufficient in the case before it, the Sixth Circuit Court of Appeals concluded that it means "only that funds of two or more investors must go into 'a common pool from which all may benefit.'" *Stone,* 8 F.3d at 1085.

The Second Circuit Court of Appeals recently and succinctly defined vertical commonality, although rejecting vertical commonality alone as insufficient to establish that an investment contract was a security:

> In an enterprise marked by vertical commonality, the investors' fortunes need not rise and fall together; a pro-rata sharing of profits and losses is not required. Two distinct kinds of vertical commonality have been identified: "broad vertical commonality" and "strict vertical commonality." To establish "broad vertical commonality," the fortunes of the investors need be linked only to the *efforts* of the promoter. *See Long v. Shultz Cattle Co., Inc.,* 881 F.2d 129, 140–41 (5th Cir.1989). "Strict vertical commonality" requires that the fortunes of investors be tied to the *fortunes* of the promoter. *See Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978).

*Revak,* 18 F.3d at 88. Of recent decisions, only that of the Ninth Circuit Court of Appeals in *Eurobond Exchange* has relied solely on vertical commonality as meeting the "common enterprise" prong of the *Howey* test. *Eurobond Exchange,* 13 F.3d at 1339.[27]

The Seventh Circuit Court of Appeals has held that horizontal commonality is an essential element of the definition of an "investment contract," for these reasons:

> The Act is a disclosure statute. It requires promoters and issuers to make *uniform* disclosure to all investors, and this requirement makes sense only if the investors are obtaining the same thing, namely an undivided share in the same pool of assets and profits.

*Wals,* 24 F.3d at 1019. Similarly, the Second Circuit Court of Appeals concluded that the *Howey* test could not be so easily satisfied as to require only "broad" vertical commonality:

> If a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry: "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise."

*Revak,* 18 F.3d at 88 (citations omitted).

■ In the face of the Eighth Circuit Court of Appeals' long silence on the issue, this court is persuaded that the weight and better reasoned of the more recent decisions, and the purpose of the securities acts to provide uniform disclosure, show that horizontal commonality is an essential element of

**27.** The Ninth Circuit Court of Appeals' decision states that

[a] common enterprise is a venture "in which the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment....'" It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. Thus, a common enterprise exists if a direct correla-

tion has been established between success or failure of [the promoter's] efforts and success or failure of the investment.

*Eurobond Exchange,* 13 F.3d at 1339 (quoting *SEC v. Goldfield Deep Mines Co. of Nevada,* 758 F.2d 459, 463 (9th Cir.1985), in turn quoting *Brodt v. Bache & Co.,* 595 F.2d 459, 460 (9th Cir.1978) (quoting *Securities and Exchange Comm'n v. Glenn W. Turner Enter.,* 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)), with other citations omitted).

the definition of an investment contract security.

■ The court concludes that there is no horizontal commonality involved in the Adventure Cattle scheme. Instead, like the condominium contracts discussed in *Teague,* each investor owns specific cattle rather than an undivided share of all of the cattle involved in the program. The nature of the investor's interest thus is different from that of a shareholder in a corporation that owns any particular assets. There is no pooling of assets, as each investor's investment of funds goes only to the purchase of that investor's cattle, and no pro-rata distribution of profits. The investor's profits depend only on the performance of the investor's own cattle and the timing of the investor's decision to sell out of the investment.

■ Even if vertical commonality alone would suffice to make an investment contract a security, the court concludes that such commonality is also lacking in this case. It does not appear that the success of any individual investor's investment was dependent on either the efforts or the fortunes of Morken, because it does not appear that the fortuity of the investments collectively is essentially dependent upon Morken's expertise. Morken did not make the decisions upon which the success of any particular investment depended: he did not arrange the financing for the investors and did not decide how many cattle to buy when, nor when to sell out of a particular group of cattle. Those decisions remained in the hands of the investors. Furthermore, the investors' fortunes were quite independent of Morken's, because each had been guaranteed a specific return on their investment. Morken enjoyed success beyond the guaranteed performance, and suffered performance below it—investors did not, at least not until the complete collapse of the scheme. Thus, the court concludes that the Adventure Cattle contracts were not "investment contract" securities under the second prong of the *Howey* test, and thus are not securities upon which securities law claims can be based. Nonetheless, the court will also consider whether the Adventure Cattle contracts meet the third prong of the *Howey* test.

### c. Expectation of profit from the effort of others

The third prong of the *Howey* test appears to have troubled courts and litigants the most. The Supreme Court attempted to clarify this third prong of the test in *Forman:*

> The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of the investors' funds.... In such cases the investor is "attracted solely by the prospects of a return" on his investment. *Howey,* [328 U.S.] at 300 [66 S.Ct. at 1103.] by contrast, when a purchaser is motivated by a desire to use or consume the item purchased—"to occupy the land or to develop it themselves," as the *Howey* Court put it, *ibid.*—the securities laws do not apply.

*Forman,* 421 U.S. at 852–53, 95 S.Ct. at 2060–61 (citations and footnotes omitted). The Fourth Circuit Court of Appeals has interpreted *Forman* as making it clear that *Howey* s third prong will be satisfied only on a showing "(1) that the opportunity provided to offerees tended to induce purchases by emphasizing the possibility of profits, (2) that the profits are offered in the form of capital appreciation or participation in earnings within the meaning of *Howey* and *Forman,* and (3) that the profits offered would be garnered from the efforts of others." *Teague,* 35 F.3d at 987.

Most often, courts examine the involvement of the parties to the investment scheme in analyzing this prong of the *Howey* test. Courts have not required that the investor invest no effort in the investment contract; only that "the most essential functions or duties must be performed by others and not the investor." *Teague,* 35 F.3d at 986 n. 7 (quoting *Bailey v. J.W.K. Properties, Inc.,* 904 F.2d 918, 920 (4th Cir.1990). Thus, in

*Eurobond Exchange* the court concluded that this prong was met where

> [the promoter's] efforts were essential to the success of both Eurobond and the investor because four ingredients were determined solely by [the promoter]: (1) when to purchase the government-issued treasury bonds, and in what denominations and yields; (2) from what funding bank to obtain the loan, as well as when to obtain it, and what currency and what interest rate to use; (3) what government-issued treasury bonds to purchase with the loans proceeds, as well as when to purchase them and in what denominations and yields; and (4) when to effect the various currency exchanges necessary for the above transactions.

*Eurobond Exchange,* 13 F.3d at 1341. Similarly, the Sixth Circuit Court of Appeals held that although investors in a tax shelter joint venture that sold recordings were responsible for the production and sale of tapes and records from the master recordings, the investors knew nothing about the music business, and there was no reason to suppose that they had any intention of becoming active in that business. *Stone,* 8 F.3d at 1086. Rather, by the terms of the joint venture agreement, they were looking to the promoter and agent of the joint venture to " 'enter into agreements ... and do all other acts necessary to carry out the affairs of the Joint Venture.' " *Id.; see also Holden,* 978 F.2d at 1119–21 (discussing a similar test for this third prong of *Howey* applicable to partnership agreements and considering the extent to which the partners looked to the managing partner or hired management to run the investment scheme).

The court concludes that the Adventure Cattle contracts are not securities under this consideration of *Howey*'s third prong. The investors here were sophisticated investors who, even if they lacked experience with cattle raising, did not look to Morken for expertise to make their investments profitable. They did not look to Morken to enter into agreements on their behalf. They left none of the investment timing and variables to Morken's decision, as did the investors in *Eurobond Exchange.* Rather, each investor negotiated the investor's own financing arrangements with a bank of the investor's choosing on terms of resulting from the investor's own negotiations. Nor does it appear anywhere in the pleadings that investors were depending on Morken to select the best performing breeds of cattle for their investments.

Instead of examining the involvement of the participants in the investment scheme in considering this third prong of the *Howey* test, some courts have looked upon the critical inquiry to be whether the plaintiff expected to receive "profits" from its investment. *RTC,* 998 F.2d at 1540. In *RTC,* the Tenth Circuit Court of Appeals looked to *Forman* s refinement of the *Howey* test to conclude that "the receipt of specified interest payments is not the apportionment of profits under *Forman.*" *Id.; see also McVay v. Western Plains Serv. Corp.,* 823 F.2d 1395, 1399 (10th Cir.1987); *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 940 F.2d 564, 576–77 & n. 10 (10th Cir.) (finding "profits" element met by employee benefit plan that yielded a profit through dividend distribution and appreciation in the value of the stock allocated to their accounts, unlike other benefit plans previously held not to meet the "profit" prong because they paid fixed or determinable benefits based on factors such as the age at which the participant retired), *cert. denied sub nom. PepsiCo, Inc. v. Uselton,* 502 U.S. 983, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991); *Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1495 (8th Cir.1984); *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1184–85 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1991); *American Fletcher Mortgage Co. v. United States Steel Credit Corp.,* 635 F.2d 1247, 1254 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981). Thus, the court in *RTC* concluded that "[b]ecause the Plaintiff received specified interest payments from the investment ..., rather than dividends tied to the profitability of the [seller] or any other entity, the [investments] do not meet the profits prong of the *Howey* test." *RTC,* 998 F.2d at 1540.

The Adventure Cattle contracts do not meet this consideration under *Howey* 's third

prong either. Adventure Cattle investors received a guaranteed 25% annualized return on their investment, or a "specified interest payment from the investment." Morken enjoyed success beyond that guarantee, and suffered performance below it, but investors enjoyed returns that were not tied to dividends or the profitability of the enterprise in general. Profits of Adventure Cattle enterprise inured only to Morken's benefit, because payouts to investors were a cost of the Adventure Cattle enterprise before any profits were determined. Thus, under either inquiry on this third prong of the *Howey* test, the Adventure Cattle contracts were not securities.

#### d. Other cattle investment schemes

Courts have considered whether a cattle investment scheme involved sale of securities subject to federal securities laws on a number of occasions.[28] The court will examine some of these decisions only to demonstrate further the characteristics of the Adventure Cattle scheme which placed it beyond the reach of the securities laws.

In *Long v. Shultz Cattle Co., Inc.,* 896 F.2d 85, 87 (5th Cir.1990) (*en banc*), the Fifth Circuit Court of Appeals reversed the trial court's determination that certain cattle investment contracts were not securities. The promoter argued that the contracts involved were individual consulting contracts for a flat fee of $20 per head of cattle, and that each investor was sophisticated and actively involved in the management of his or her own investment. *Id.* The appellate court found that, although investors paid a flat fee up front for "consulting" services from the promoter,

had the right to select the embryos and otherwise make decisions concerning efforts to breed superior strains of cattle. However, the court determined that in all practicality, the investors relied on the promoters for the expertise to conduct the cattle breeding program. *Id.* at 923–25. The court remarked that

> [i]f the investment scheme had been merely to raise cattle for slaughter, the interests purchased by the plaintiffs may not have constituted investment contracts. The plaintiffs had the practical ability to exercise control over the raising and sale of their cattle. All were sophisticated business men and lived near Albemarle. Even if the plaintiffs had no direct knowledge of or experience with raising and selling cattle, they could have hired others to care for the cattle, and unlike the citrus grove in *Howey*, cattle are easily moved. The existence of readily available alternatives made the plaintiffs less dependent on Albemarle and suggests that this aspect of the program itself may not constitute an "investment contract."

The court does not believe that it would be profitable to examine the minutiae of these decisions looking for distinctions or similarities. These cases do not stand for the broad proposition that all cattle feeding investments are investment contracts subject to securities laws. The court must determine whether the specific agreement before it is an investment contract under the principles articulated in *Howey* and cannot dodge that responsibility simply by citing a list of cases presenting different circumstances. The court does believe that examination of one or two of these cases to demonstrate the distinctive features of the Adventure Cattle scheme would be instructive, however.

**28.** In *Long v. Schultz Cattle Co., Inc.,* 881 F.2d 129, 136 n. 7 (5th Cir.1990), the first panel decision subsequently upheld at 896 F.2d 85 (5th Cir.1990) (*en banc*), the court recognized that cattle raising schemes were "variation[s] on a popular theme, and nearly all of the variations had been held to fall within securities laws as involving "investment contracts" securities. The court cited the following cases: *Babst v. Morgan Keegan & Co.,* 1987 WL 15322 (E.D.La. Aug. 6, 1987); *Waterman v. Alta Verde Indus., Inc.,* 643 F.Supp. 797 (E.D.N.C.1986), *aff'd mem.,* 833 F.2d 1006 (4th Cir.1987) (cattle-feeding program was investment contract); *McLish v. Harris Farms, Inc.,* 507 F.Supp. 1075 (E.D.Cal.1980) (cattle-feeding program was investment contract); *Barry v. Ceres Land Co., Inc.,* Fed.Sec. L.Rep. ¶ 99,008 (D.Minn.1978) (cattle-feeding program was investment contract); *Plunkett v. Francisco,* 430 F.Supp. 235 (N.D.Ga.1977) (cattle lease and calf maintenance program was investment contract); *Boone v. GLS Livestock Mgmt., Inc.,* Fed.Sec.L.Rep. ¶ 97,174 (D.Utah 1976) (cattle breeding and feeding program was investment contract); *see also Continental Mktg. Corp. v. Securities & Exchange Comm'n,* 387 F.2d 466 (10th Cir.1967), *cert. denied,* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); *Miller v. Central Chincilla Group, Inc.,* 494 F.2d 414 (8th Cir.1974) (chincilla breeding program was investment contract); *and compare Nichols Charolais Ranch, Inc. v. Barton,* 460 F.Supp. 228 (M.D.Fla.1975), *aff'd,* 587 F.2d 809 (5th Cir. 1979) (cattle feeding contract was not investment contract where contract was not part of larger program and investor actively managed his cattle business).

*Bailey v. J.W.K. Properties, Inc.,* 904 F.2d 918 (4th Cir.1990), by contrast, involved a cattle breeding program in which investors ostensibly

the investment package offered by [the promoter] was far more encompassing, involving hundreds of investors in a cattle raising operation that [the promoter] actively supervised, pooling of assets to purchase the cattle (resulting in the ownership by each investor of an undivided interest in the cattle poundage in one or more pens), and sharing among investors of the risks of cattle loss and of various feeding expenses. Moreover, as we concluded in the panel opinion, "[d]espite the formal representations [in the consulting agreements] that investors would actively manage their own cattle-feeding businesses, the evidence was undisputed that in reality, [the promoter's] clients did not have the wherewithal to manage a cattle-feeding business and relied instead on [the promoter] to make all essential managerial decisions."

*Long,* 896 F.2d at 87. *Long* is distinguishable from the present case on each of these critical factors. Here, there is no pooling of assets to purchase cattle resulting in an undivided interest in the cattle poundage, but purchase by the investor of a specific group of cattle and retention only of an interest in that group of cattle. Thus, risks were not shared, beyond the risks to anyone purchasing cattle in the market generally, and each investor bore the individual costs of feeding the cattle without sharing that cost with other investors or the promoter. Although investors in Adventure Cattle may not have had the "wherewithal" to manage a cattle-feeding business, they did exercise the authority over the *investment,* in that they could decide how to finance their investment and when to sell out of it.

In *Seale v. Miller,* 698 F.Supp. 883 (N.D.Ga.1988), the district court concluded that a cattle investment scheme in which the investors took a more active role than the investors did in the scheme involved in *Long,* did involve the sale of securities. In *Seale,* the court based its conclusion on the third prong of the *Howey* test:

[B]oth the understanding of all the parties as to the agreement and the undisputed economic realities of the situation indicate that Alta Verde was expected to have primary control over the purchase, feeding, care and sale of the investor's cattle. Alta Verde does not dispute that it agrees to purchase cattle for the investor, feed the cattle and care for their veterinary needs, and sell the cattle at the end of the feeding cycle. The parties do not dispute that investors may have a more active role if they so choose, but there is nothing in the record to indicate that plaintiff ever intended to become involved in the maintenance and care of his cattle or that defendants had the least expectation that he would do so....

The court concludes that the Alta Verde program and the agreement between the parties meets the *Howey* test because the efforts contemplated and performed by Alta Verde are the "undeniably significant ones ... which affect the failure or success of the enterprise."

*Seale,* 698 F.Supp. at 892. The court's focus was therefore on the day-to-day management of the cattle feeding enterprise, and not on the management of investment decisions. This court respectfully disagrees with that focus. *Howey* focuses on who makes the investment decisions, and in this case, those decisions were made by the individual investors. The investors decided how many cattle to purchase, paid the day-to-day costs of maintaining them, and decided when to sell out of the investment, rather than relying upon Morken to make decisions about the sale of cattle at the end of the feeding cycle. Thus, *Seale* is also distinguishable.

Ultimately, the court is persuaded that the Adventure Cattle contracts were not securities under the *Howey* test, because the investors owned specific cattle and retained the rights to pursue alternatives for them, making them less dependent upon Morken than were investors in other cattle raising schemes. *Cf. Bailey,* 904 F.2d at 922–23. The fact that Morken may have crafted this scheme specifically to escape the reach of securities laws does not change the fact that the investment scheme, in this court's view, falls outside of the definition of securities. Because the Adventure Cattle contracts were not securities, plaintiffs have not stated in Counts II and III claims pursuant to the securities laws upon which relief can be

granted. These counts must therefore be dismissed.

### 3. Definition Of A "Seller" Of Securities

In the alternative, the court will consider defendants' contentions that the counts founded on violations of the securities laws must be dismissed because defendants were not "sellers" of the Adventure Cattle contracts even if those contracts were "securities." The Securities Act of 1933 "nowhere delineates who may be regarded as a statutory seller [under section 12], and the sparse legislative history sheds no light on the issue"; furthermore, the courts of appeals "have not defined the term uniformly." *Pinter v. Dahl,* 486 U.S. 622, 642, 108 S.Ct. 2063, 2076, 100 L.Ed.2d 658 (1988). In *Pinter,* the Court established the meaning of the term as used in § 12(1). *Id.* All courts to consider the question since *Pinter* have applied its definition to § 12(2) as well. *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1528 (11th Cir.1991).

#### a. Liability for solicitation

Under *Pinter,* the term "seller" includes the person "who successfully solicits the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter,* 486 U.S. at 647, 108 S.Ct. at 2078; *Commercial Union Assur. Co., PLC v. Milken,* 17 F.3d 608, 616 (2d Cir.1994) (citing *Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1125 (2d Cir.1989) ("statutory sellers [are] only those who actually solicit the sale of securities for financial gain")), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). However, "§ 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale." *Pinter,* 486 U.S. at 650, 108 S.Ct. at 2079. The meaning of "seller" was further developed by the Court:

"A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securi-

ties vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title.

*Id.* at 644–45, 108 S.Ct. at 2077–78; *see also Ryder,* 943 F.2d at 1525 ("the *Pinter* Court concluded that participants in the transfer of securities who "solicit" a purchase may also be liable as "sellers" under section 12(1) of the 1933 Act—even though they do not own the securities"). *Pinter* has been interpreted as establishing a two part test to identify those participants in the sale of a security who may be held liable as sellers:

"First, whether the participant in the sale 'solicited' the purchase; and second whether the participant or the owner of the security sold benefited." Reece, *Would Someone Please Tell Me the Definition of the Term 'Seller': The Confusion Surrounding Section 12(2) of the Securities Act of 1933?,* 14 Del.J.Corp.L. 35 (1989). *See, e.g., Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1127 (2d Cir.1989) (lawyers should not be exempt from section 12(2) liability where they earn a commission from an actual seller for persuading their clients to make a particular investment).

*Ryder,* 943 F.2d at 1531.

In "grappling with the line drawn by *Pinter,*" the Second Circuit Court of Appeals has ruled that "a law firm that performed strictly ministerial acts was 'collateral' to a transaction, but 'brokers who might act on the seller's behalf for a profit' could be liable." *Milken,* 17 F.3d at 616 (citing *Wilson,* 872 F.2d at 1126–27). Similarly, a non-owner of a security can be a "seller" and thereby incur liability under the securities laws if the non-owner "urges a prospective purchaser to buy." *Smith v. American Nat'l Bank & Trust Co.,* 982 F.2d 936, 941 (6th Cir.1992) (citing *Pinter,* 486 U.S. at 644–45, 108 S.Ct. at 2077). Under this "solicitation" theory of liability, it is not enough that the putative seller stands to benefit from the sale of the security; he must have engaged in actual solicitation. *Smith,* 982 F.2d at 941. Courts have found that *Pinter* rejected a "proximate

cause" or "substantial factor" theory of liability; instead, the defendant must either have "passed title or offered to do so, or solicited the offer." *Id.* at 941–42. Providers of professional services, such as accountants and lawyers, do not usually meet this test, because "[t]he buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person." *Ryder,* 943 F.2d at 1527 (quoting *Pinter,* 486 U.S. at 651, 108 S.Ct. at 2080). Nor do such participants "solicit" the purchase of securities as that word is understood "in common parlance." *Id.*

In *Smith v. American Nat'l Bank & Trust Co.,* 982 F.2d 936 (6th Cir.1992), the Sixth Circuit Court of Appeals considered allegations that a bank was a "seller" of a security, but the court found that the complaint failed to state either that the bank passed title to the securities, or solicited an offer from plaintiff to buy them. *Smith,* 982 F.2d at 942. Rather, the complaint alleged that the owner of the securities solicited the purchase of the securities and that at most the bank encouraged the owner to find an investor as an alternative to losing his entire business. *Id.* Similarly, a bank that provided financing to a seller of securities was not a statutory seller, because the bank "did' not actively participate in the solicitation of investors, nor did it participate in the preparation of the Prospectus ... [and did not] otherwise actively promote the investment program." *Id.* (quoting *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 940–41 (7th Cir.1989).

In *Ackerman v. Federal Deposit Ins. Corp.,* 973 F.2d 1221 (5th Cir.1992), the Fifth Circuit Court of Appeals also examined a claim for liability against a bank as a "seller" of securities. However, in *Ackerman,* the court concluded that

> Appellants presented no evidence to refute the Bank's proof that it played no part in offering the interests to Appellants or in drawing up offering documents, and, in fact, did not become involved in the transaction at all until approximately four months after Appellants signed the notes. On these facts, the district court correctly concluded that the Bank was not a "seller" of unregistered securities under federal securities law. *See Pinter v. Dahl,* 486 U.S.

622, 641–655, 108 S.Ct. 2063, 2075–2082, 100 L.Ed.2d 658 (1988) (a "seller" for purposes of § 12 of the Securities Act of 1933, 15 U.S.C. § 77l, is one who passes title or solicits the purchase of a security); *Cyrak v. Lemon,* 919 F.2d 320, 324–25 (5th Cir. 1990).

*Ackerman,* 973 F.2d at 1223.

In *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521 (11th Cir.1991), the Eleventh Circuit Court of Appeals concluded that although a bank may certainly have expected to profit financially from the sale or purchase of securities by a customer to whom it provided banking services, the bank still could not be held liable as a "seller" of securities unless it also "solicited" the sale of those securities, in order for the bank to meet both prongs of *Pinter. Ryder,* 943 F.2d at 1531. Where the bank only executed the customer's orders to buy certain securities, and did not "urge" or "persuade" the buyer to buy those securities, it did not solicit purchase of the securities even if it obtained them for the buyer. *Id.*

Plaintiffs repeatedly assert that defendants solicited investors in Adventure Cattle and paid finders fees to persons who found qualified investors who would finance their investments through one of defendants' banks. However, defendants contend that there are no more than conclusory allegations of solicitation in the complaint without factual support, and that, at most, the complaint alleges that defendants solicited users of the banks' lending services, not investors in Adventure Cattle. Plaintiffs assert that their allegations that plaintiffs promoted expansion of the Adventure Cattle program are sufficient pleadings of solicitation.

The court concludes that it would be possible for plaintiffs to prove a set of facts from which a factfinder could conclude that defendants solicited investors in Adventure Cattle, and not merely solicited investors in Adventure Cattle to finance their investments through one of the defendant banks. However, whether or not defendants were "sellers" on the basis of adequate proof of solicitation is a moot question if the contracts involved were not "securities." The court concluded above that the Adventure Cattle

contracts are not securities. Thus, even if the bank solicited investors in Adventure Cattle, and did not just solicit users of its lending services to finance their investments, the bank was not a "seller" of "securities," and plaintiffs' securities law claims must fail.

### b. "Control person" liability

Pursuant to § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), another way a non-owner of the securities may become liable for sales in violation of the securities laws is if the non-owner is a "controlling person" of a seller of securities. *Martin v. Shearson Lehman Hutton, Inc.,* 986 F.2d 242, 244 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 177, 126 L.Ed.2d 136 (1993). The court in *Martin* considered the language and "reach" of the statute as follows:

[The statute states that] any person who directly or indirectly controls any person who is liable for selling securities in violation of the act is liable to the same extent as the seller, unless he acted in good faith and did not directly or indirectly induce the act at issue. . . .

We have held that the statute reaches persons who have only "some indirect means of discipline or influence" less than actual direction. *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). In *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 1072, 106 S.Ct. 798, 832, 88 L.Ed.2d 774, 804 (1986), we held that liability did not depend on the controlling person's having exercised control over the particular transaction that gave rise to the violation. We think that O'Leary's solicitation of the business while she was an employee of Shearson is sufficient to make out a prima facie case of controlling person liability [against Shearson]. As the district court pointed out in its order denying Shearson's post-trial motions, Shearson's agent solicited the purchase of the stock and misrepresented its nature. Shearson had the ability to discipline O'Leary's conduct, and it was this conduct that gave rise to the loss. *See also Lewis v. Walston & Co.,* 487 F.2d 617, 623–24 (5th Cir.1973).

*Martin,* 986 F.2d at 244 (8th Cir.1993); *see also Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 485 (6th Cir.1992) ("A "controlling person" shares the liability for violations of securities laws with the primary violator it controlled," and applying the Eighth Circuit's test from *Metge* to determination of who is a controlling person), *cert. denied,* —— U.S. ——, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

 *Metge* established a two-prong test for control person liability: the plaintiff must establish "that the defendant lender actually participated in (i.e., exercised control over) the operations of the [borrower/violator] in general . . . [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Metge,* 762 F.2d at 631; *see also Sanders,* 973 F.2d at 486.

In *Metge,* the lender alleged to occupy a control person role had acquired substantial additional powers beyond a simple security interest in property. The lender held nearly 20% of the borrower's stock, held a proxy on a controlling interest of the borrower's subsidiary, had power over the borrower's policy regarding capital stock, bank personnel attended board meetings, and it influenced the borrower's debt structure. *Metge,* at 631. Despite all of this power, the Eighth Circuit held that the facts suggested only the potential for control, not actual control. *Metge* at 632. *Sanders,* 973 F.2d at 486. However, extending a loan to a company and taking measures to secure that loan do not amount to actual control. *Id.* (citing *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949 (7th Cir.1989)).

 The court concludes that plaintiffs have not adequately pleaded "control person" liability in this case. Plaintiffs have not alleged, and could not allege, that the banks in question here exercised control over Morken because of "additional powers" beyond control of banking services. *Metge,* 762 F.2d at 631. Defendants had no share in either Morken's or SGLE's assets, nor did they participate in management of the Adventure Cattle enterprise, whatever their involvement may have been in the banking scheme. *Id.*

Nor did they have the power to control Morken's offering of Adventure Cattle contracts, or to control the details of the investment scheme in a manner analogous to issuance of a securities prospectus. Therefore, plaintiffs' assertion of liability on the ground that defendants were "controlling persons" must fail.

### c. *Liability for failure to make disclosures*

Plaintiffs argue that defendants should be held liable for their failure to disclose Morken's poor financial condition to potential investors in his scheme. The duty to disclose in securities cases comes in part from § 10(b) and Rule 10b–5 promulgated thereunder. A Rule 10b–5 cause of action is distinct from one for common law fraud, and indeed the legislative history of the Securities Exchange Act indicates that Congress concluded that the common law remedies of deceit, fraud, and misrepresentation were inadequate and unfair to the average investor. *Riley*, 45 F.3d at 774.

Section 10(b) and Rule 10b–5 provide that silence can be misleading and that there may be a duty to break that silence:

> In *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988), the Supreme Court observed that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." A duty arises, however, if there have been inaccurate, incomplete or misleading disclosures. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987).

*Sailors v. Northern States Power Co.*, 4 F.3d 610, 612 (8th Cir.1993); *Smith*, 982 F.2d at 943 ("silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10b ... [but] [s]ilence is not actionable ... unless there is 'a duty to disclose arising from a relationship of trust and confidence,'" citing *Basic Inc.*).

▮ In order for a seller to incur liability for failure to disclose information, the seller must have a legally cognizable duty to disclose the information in question. *In re Lyondell Petrochemical Co. Securities Litigation*, 984 F.2d 1050, 1052 (9th Cir.1993). The Eleventh Circuit Court of Appeals, for example, has held that accountants generally have a duty to disclose to investors actual knowledge of a company's fraud. *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir.1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987).

In *Smith v. American Nat'l Bank & Trust Co.*, 982 F.2d 936 (6th Cir.1992), the Sixth Circuit Court of Appeals also considered claims founded on § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 against a bank both on the basis of direct liability and as an "aider and abettor." *Smith*, 982 F.2d at 942. The court noted that a duty to disclose might be based on a fiduciary relationship, but "[a] fiduciary relationship cannot be predicated on one party's superior knowledge of the facts surrounding a transaction when the relevant facts are readily available to both parties." *Id.* Thus, the court in *Smith* held that because plaintiff had failed to allege that material facts were not readily available to him, the bank had no duty to disclose negative information to the plaintiff concerning its customer's financial situation. *Id.* Further,

> [p]rior to the meeting with the bank, for one thing, [the owner of the securities] told [the plaintiff] that the reason he needed half a million dollars immediately was to cover outstanding checks that were going to have to be made good at the bank.... [The plaintiff] made no inquiry at all about the reason for the overdrafts; he did not ask [the owner], and he did not ask the bank officials with whom he subsequently met.
>
> If the bank knew about the check-kiting—and we shall assume that it did—the bank still had no duty to answer questions that plaintiff ... never asked. For all the bank knew, [the owner] had told plaintiff ... about his check-kiting activities, just as he had told the accounting firm. "[A] person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession."

*Smith*, 982 F.2d at 942 (Citation omitted). The complaint in this case does not allege

that any of the plaintiffs ever asked the defendants about Morken's financial condition, nor does it assert that the defendants were aware of what information had already been provided to investors concerning Morken's financial condition. The complaint does not establish a duty to disclose on this basis.

Turning to an issue also specifically raised in this litigation, the court in *Smith* considered whether there was a general duty to disclose information to a borrower concerning the weak financial position of a customer with whom the borrower intends to invest:

> The fact that the bank was in the business of lending money did not subject it to any special duty of disclosure. A lending institution has no duty to disclose based on its role as a lender. *Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989). And knowledge of a customer's weak financial situation "amounts neither to a duty to disclose this information nor to knowledge of fraud." *Id.* at 1481.

> [The owner of the securities] may or may not have violated the securities laws, but plaintiff ... clearly could not make out a § 10b/Rule 10b–5 claim against the bank for aiding and abetting him. "A claim of aiding and abetting under these sections requires allegations that the accused party knowingly and substantially assisted another party's violation of the securities law, and that the accused had a general awareness that it was participating in an overall improper activity." *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 486 (6th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

> * * *

> In cases involving non-disclosure, moreover, the requirement that the alleged aider and abettor knowingly and substantially assisted another party's security violation is "particularly exacting." *Moore v. Fenex, Inc.*, 809 F.2d 297, 303 (6th Cir.), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). The plaintiff "must show that the silence of the accused aider and abettor 'was consciously intended to aid the securities law violation,' and must prove either a culpable state of mind, or conduct from which a culpable state of mind can be inferred." *Id.* at 303–04, quoting *Washington County*, 676 F.2d at 226.

*Smith*, 982 F.2d at 942. The court concluded that plaintiff had failed to mount any of these hurdles in proving his claim for liability of the bank under the securities laws. *Id.* In the present case, the complaint asserts that defendants' silence concerning Morken's financial condition was intended to aid Morken in pursuing his securities law violations, thereby enhancing defendants' financial position and increasing its fees from Morken. However, the court has concluded that there were no sales of "securities" upon which to base claims that Morken violated securities laws, so there can be no showing that defendants knowingly and substantially assisted Morken in violating securities laws.

More devastating still to any allegations that defendants aided and abetted in violations of § 10(b) is the recent decision of the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, — U.S. —, —–—, 114 S.Ct. 1439, 1447–48, 128 L.Ed.2d 119 (1994), which holds that the "directly or indirectly" language of § 10(b) does not impose "aiding and abetting" liability. The Court concluded that "aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Id.* at —, 114 S.Ct. at 1447. Because Congress knew how to impose aiding and abetting liability when it intended to, the failure of the statute to state such liability means that none was intended. *Id.* at —, 114 S.Ct. at 1448. Any ground for securities law liability under § 10(b) based on aiding and abetting must also fail.

Although at this stage in the proceedings, the court is not prepared to find as a matter of law that defendants did not "solicit" purchases of Adventure Cattle contracts, the court has concluded that the Adventure Cattle contracts were not "securities," and there-

fore defendants did not "solicit" purchases of "securities" in violation of the securities laws.[29] Even if the Adventure Cattle contracts are securities, however, the defendants did not exercise the kind of control over Morken that would be necessary to incur "control person" liability, nor did defendants have a duty to make disclosures upon which to found liability. Thus, only if the Adventure Cattle contracts were "securities" and defendants can be shown to have "solicited" purchases of those "securities" will defendants incur "seller" liability. There being no "securities" involved, however, defendants cannot incur liability under the securities laws, and plaintiffs' Counts II and III must be dismissed. Having disposed of all federal claims presented in the complaint, the court turns next to the motion to dismiss the state law claims found in Counts IV and V.

### E. Common Law Fraud

In additional to the mail and wire fraud claims that are pleaded as RICO predicate acts in Count I of the Complaint, plaintiffs also allege common law fraud on the part of the defendants.[30] Defendants assert that the pleading of this common law fraud count is deficient under *Fed.R.Civ.P.* 9(b), and further that honoring checks cannot constitute fraud. Plaintiffs argue that they have alleged fraud with sufficient particularity.

The court concludes that the pleading of fraud here, like the pleading of mail and wire fraud in the RICO count, runs afoul of the requirements of *Fed.R.Civ.P.* 9(b). Although the complaint alleges one of the crucial elements of fraud, justifiable reliance, *First Fin. Fed. Sav. & Loan Assoc. v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685, 686 (8th Cir. 1987) (applying New York law), and in stating in what respect some, at least, of the statements are allegedly false or misleading, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993), it is deficient in other respects.

Rule 9(b) clearly imposes obligations additional to those stated in *Fed.R.Civ.P.* 8, which establishes notice pleading. *In re*

*GlenFed, Inc., Securities Litigation*, 42 F.3d 1541, 1547 (9th Cir.1994). The statement of the claim must also aver with particularity the circumstances constituting the fraud. *Id.* (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1297, at 615 (1990), which states that Rule 9(b) "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules...."). Rule 9(b) "would clearly be superfluous if its only function were to ensure that defendants are provided with that degree of notice which is already required by Rule 8(a)." *Id.*

Rule 9(b) "particularized allegations of the circumstances constituting fraud." *Id.; Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994) (Rule 9(b) "requires that 'the circumstances constituting fraud ... shall be stated with particularity' "). Under the rule, allegations of fraud in a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* (describing these as "time, place, and content" requirements); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995); *Mills*, 12 F.3d at 1175 (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Scienter may, within limits, be pleaded in conclusory fashion. *Id.* However,

> general averments of the defendants' knowledge of material falsity will not suffice. Consistent with *Fed.R.Civ.P.* 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged.

*Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 174 (1st Cir.1994) (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994)). The purpose of this pleading rule is to pro-

---

**29.** For the same reason, defendants were not "underwriters" of any "securities," see 15 U.S.C. § 77b(11), and cannot incur liability on account of that status under the securities laws either.

**30.** The common law fraud allegations are presented in full, *supra*, at n.

vide notice to the defendant so that it can provide an adequate answer. *Kaplan*, 49 F.3d at 1370.

The complaint here alleges fraud based only on conclusory allegations that unidentified defendants worked independently and with Morken to assure unidentified investors and suppliers that Morken's business ventures were financially sound. It does not identify when and in what form these allegedly false statements were made. Even those allegations based on "prop[ping] up Morken's ventures through the honoring of overdrafts" do not identify any specific transactions that would have given the allegedly misleading impression that Morken had no overdrafts. As a further matter, checks drawn on insufficient funds do not constitute misrepresentations. *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982) ("[a] check is not a factual assertion at all and therefore cannot be characterized as 'true' or 'false' "); *United States v. Burnett*, 10 F.3d 74, 78–79 (2d Cir.1993) (checks do not constitute misrepresentations); *United States v. Cronic*, 900 F.2d 1511, 1515–16 (10th Cir.1990) (checks drawn on insufficient funds do not constitute misrepresentations). Thus, plaintiffs have failed to meet a substantive requirement of a common-law fraud claim as to honoring of insufficient fund checks, and failed to meet the requisite particularity in the pleading of all of the common-law fraud claims. Count V must therefore be dismissed.

Although the court concludes that the deficiencies in the pleading of the common-law fraud claim here could be cured, the court suggests that any refiling of the claim be in state court. Unless it can be brought as a supplemental claim to a viable federal claim, the common-law fraud claim will ultimately end up in state court anyway, and plaintiffs may avoid a delay from resolution of federal jurisdictional matters by going directly to state court to prosecute state-law claims.

### F. Common Law Wrongful Conversion Or Set–Off

The final claim to be considered here is Count IV of the amended complaint, which alleges wrongful conversion or set-off.[31] Defendants' challenge to this count of the complaint is different in kind from all of the other grounds for dismissal offered in their motion. Defendants contend that this claim must be dismissed for failure to join indispensable parties, identified as the trustees of the bankruptcy estates of both Morken and SGLE. Thus, this part of the motion to dismiss is brought pursuant to *Fed.R.Civ.P.* 12(b)(7). Defendants argue that without the bankruptcy trustees as parties, adjudication of a conversion or set-off claim in this court will be severely prejudicial to defendants, because it would threaten to leave defendants subject to the risk of multiple or inconsistent obligations as the issue is also likely to arise in the context of the bankruptcy proceedings. Defendants also argue that plaintiffs have an adequate remedy in bankruptcy court. Plaintiffs argue that all necessary parties have been joined, because the trustee for Morken's estate has abandoned the Adventure Cattle contracts, the actual cattle, and their proceeds, and the trustee for SGLE has never asserted a claim to these assets.[32] Further, plaintiffs argue that the cause of action for wrongful set-off belongs not to the bankruptcy estates, but to the creditors of the estates, here the investors and suppliers.

In resolving the motion to dismiss as to this last claim, the court must first determine the standards applicable to a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(7), then turn to the application of those standards to the present matter.

### 1. Standards For Dismissal Pursuant to Rule 12(b)(7)

*Fed.R.Civ.P.* 12(b)(7) provides that

[e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim,

---

**31.** The allegations of a wrongful conversion or set-off are presented in full, *supra*, in n. 7.

**32.** Plaintiffs also argue that they have adequately pleaded facts amounting to a set-off, but the merits of the pleadings have never been called into question on this claim, only whether the parties necessary for its adjudication have been joined.

counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (7) failure to join a party under Rule 19....

*Fed.R.Civ.P.* 12(b)(7). As far as the court has been able to ascertain, the Eighth Circuit Court of Appeals has never articulated standards for disposing of a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(7), and district courts of this circuit have confronted the question but rarely.[33] However, the courts of appeals of other circuits have recently considered the applicable standards and analytical process for disposing of a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(7).

The Seventh Circuit Court of Appeals concisely described the analytical process for disposition of a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(7):

[I]n deciding a Rule 12(b)(7) motion to dismiss, we must apply Rule 19(b) if we first determine that the party to be joined satisfies the threshold requirements of Rule 19(a). *Moore v. Ashland Oil, Inc.,* 901 F.2d 1445, 1447 (7th Cir.1990). Thus, Rule 19(a) requires joinder when the presence of the party to be joined is essential to the litigants' complete relief, or when the party to be joined must be present to protect its own or another party's interests. *Fed.R.Civ.P.* 19(a). If the court finds that the requirements of Rule 19(a) are satisfied, it may dismiss the action if, in weighing four additional factors specified in Rule 19(b), those factors so indicate.

*Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l,* 15 F.3d 1419, 1422–23 (7th Cir.1994). Other circuits have applied very similar analyses to such motions. *See Keweenaw Bay Indian Community v. State of Mich.,* 11 F.3d 1341 (6th Cir.1993);[34] *Bank*

---

**33.** And those rare district court opinions from this circuit to address the question have generally provided but little guidance. *See, e.g., Parsons v. Burns,* 846 F.Supp. 1372, 1382 (W.D.Ark.1993) (granting motion pursuant to Rule 12(b)(7) by dismissing portion of complaint seeking compensation on the part of the plaintiff's wife on the ground that the wife had not been joined as a party, but offering no further discussion); *United States v. Scherping,* No. 4–89–825, 1992 WL 188817 (D.Minn.1992) (unreported decision citing 5A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1359 at 426–27 (2d ed. 1990), and 7 Charles A Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1609 at 130 (2d ed. 1986), for the applicable standards); *Manypenny v. United States,* 125 F.R.D. 497, 500 (D.Minn.1989) (referring to *Fed.R.Civ.P.* 19 for the standards applicable to a motion to dismiss pursuant to Rule 12(b)(7)); *Hendrickson v. Griggs,* 672 F.Supp. 1126, 1132 (N.D.Iowa 1987) (finding the Eighth Circuit's decision in *R.W.T. v. Dalton,* 712 F.2d 1225, 1233 (8th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), established that juvenile court judges were not indispensable parties claims under the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5633); *Pinson v. Depco, Inc.,* 602 F.Supp. 27, 29 (D.S.D. 1985) (stating that Rule 19 standards apply to a Rule 12(b)(7) motion, but not stating what those Rule 19 standards are); *deVries v. Weinstein Int'l Corp.,* 80 F.R.D. 452, 454–56 (D.Minn.1978) (looking to Rule 19 for standards to dispose of Rule 12(b)(7) motion with some discussion of Rule 19's requirements); *Doe v. Exon,* 416 F.Supp. 716, 719 (D.Neb.1975) (concluding without discussion of standards that parents had insufficient interest in minor daughter's pregnancy

to be necessary parties requiring dismissal pursuant to Rule 12(b)(7)); *Green v. Missouri Pacific R.R. Co.,* 62 F.R.D. 434, 437 (E.D.Mo.1973) (finding parties were not indispensable without discussing standards applicable to either Rule 12(b)(7) or Rule 19); *Cather v. Ocean Accident & Guarantee Corp., Ltd.,* 94 F.Supp. 511, 513 (D.Neb.1950) (referring to Rule 19 for standards for dismissal under Rule 12(b)(7)).

**34.** In *Keweenaw Bay Indian Community,* the Sixth Circuit Court of Appeals applied an analytical process identical in its essentials to that employed by the Seventh Circuit Court of Appeals:

[T]he resolution of the question of joinder under Rule 19, and thus of dismissal for failure to join an indispensable party under Rule 12(b)(7), involves a three-step process. [Internal citation omitted]. The court must first determine whether a person is necessary to the action and should be joined if possible. Rule 19(a) describes this initial analysis.... If the court finds that the absent person or entity ... is one to be joined if feasible[,] [t]he court must then consider steps two and three: the issues of personal jurisdiction and indispensability. Pursuant to the second step in our three-step Rule 19 analysis, we consider ... whether the absent [party or parties], as [a] necessary [party or] parties, can be made parties to this action....

Faced ... with necessary parties that cannot be made parties to the action, we turn to Rule 19(b) and address whether these parties are indispensable, such that "in equity and good conscience" the action should be dismissed.

*One Texas, N.A. v. A.J. Warehouse, Inc.,* 968 F.2d 94, 100 (1st Cir.1992) (in analyzing a motion to dismiss pursuant to Rule 12(b)(7), the court found that the absent party was not a necessary party under Rule 19(a), and consequently could not be an indispensable party under Rule 19(b), and therefore affirmed denial of the motion to dismiss); *McLaughlin v. International Ass'n of Machinists and Aerospace Workers, AFL–CIO, Local Lodges 751–A and 751–C,* 847 F.2d 620, 621 (9th Cir.1988) ("Two separate inquiries must be made" under Rule 12(b)(7), that under Rule 19(a), concerning whether a party is necessary, then, if the party is necessary but cannot be joined, whether that party is indispensable). Because Rule 19(a) states that "the court *shall* order the person to be made a party" if it is found to be indispensable, "dismissal of a complaint for failure to join an indispensable party is entirely appropriate under Rule 12(b)(7), but dismissal *with prejudice* should ordinarily result only after the court has ordered the party joined and the plaintiff has failed to do so." *Sladek v. Bell Sys. Management Pension Plan,* 880 F.2d 972, 980 (7th Cir.1989) (with emphasis supplied by that court).

The proponent of a motion to dismiss under *Fed.R.Civ.P.* 12(b)(7) has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence. *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994) (citing *Ilan–Gat Eng'rs, Ltd. v. Antigua Int'l Bank,* 659 F.2d 234, 242 (D.C.Cir. 1981); *Martin v. Local 147, Int'l Bro. of Painters and Allied Trades, AFL–CIO–CFL,* 775 F.Supp. 235, 236–37 (N.D.Ill.1991); *Ashley v. American Airlines, Inc.,* 738 F.Supp. 783, 788 (S.D.N.Y.1990)). The proponent's burden can be satisfied by providing "affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence." *Id.* (citing *Martin,* 775 F.Supp. at 236, in turn quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359, at 427 (1990)). There appears to be a split in authority as to the review accorded the district court's grant of a motion to dismiss pursuant to Rule 12(b)(7). *Compare Id.* (appellate court will "review a Rule 12(b)(7) dismissal for abuse of discretion," citing *Navajo Tribe of Indians v. New Mexico,* 809 F.2d 1455, 1471 (10th Cir.1987)), *with McLaughlin v. International Ass'n of Machinists,* 847 F.2d 620, 621 (9th Cir.1988) ("A dismissal under Rule 12(b)(7) Fed. R.Civ.P. ('failure to join a party under Rule 19') is subject to *de novo* review," citing *Franz v. East Columbian Basin Irrigation District,* 383 F.2d 391 (9th Cir.1967)).

Although the Eighth Circuit Court of Appeals has not specifically considered standards for dismissal under Rule 12(b)(7), the court has discussed the standards for dismissal under Rule 19, upon which a Rule 12(b)(7) motion to dismiss is expressly based. In *Gwartz v. Jefferson Memorial Hosp. Ass'n,* 23 F.3d 1426 (8th Cir.1994), the court described the analytical process under Rule 19, which governs when joinder of a particular person is compulsory:

"A court must first determine whether a [person] should be joined if 'feasible' under Rule 19(a)," [*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 404 (3d Cir.1993) ], i.e., whether a person is "necessary." If the person is not necessary, then the case must go forward without him and there is no need to make a Rule 19(b) inquiry....

Under Rule 19(a), a person "shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties." *Fed.R.Civ.P.* 19(a)(1). Subsection "(a)(1) requires joinder only when the absence of the unjoined party prevents complete relief among the current parties.... The focus is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person." *LLC Corp. v. Pension Benefit Guar. Corp.,* 703 F.2d 301, 305 (8th Cir.1983).

*Id.* at 1428. In the case before it, the court concluded that the party sought to be joined was not a necessary party under Rule 19(a), thus the court did not need to address whether it was an indispensable party under

*Keweenaw Bay Indian Community,* 11 F.3d at 1346–47.

Rule 19(b). *Id.* at 1430. The court therefore concluded that the district court had erred in dismissing the plaintiff's lawsuit under Rule 19. *Id.;* [35] *Cf. State of South Dakota v. Bourland,* 949 F.2d 984, 989 (8th Cir.1991) (trial court properly allowed case to proceed having determined that identified persons were not indispensable under Rule 19), *rev'd on other grounds,* ── U.S. ──, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). However, in the absence of a person necessary to accord complete relief among the parties, Rule 19(a) provides that "if such a person has not been so joined, the court shall order that the person be made a party." *Diagnostic Unit Inmate Council v. Motion Picture Ass'n of Am., Inc.,* 953 F.2d 376, 378 (8th Cir.1992).

▇▇▇ In *Ranger Transp., Inc. v. Wal-Mart Stores,* 903 F.2d 1185 (8th Cir.1990), the Eighth Circuit Court of Appeals distinguished between a "necessary" party under Rule 19(a), and an "indispensable" party under Rule 19(b):

> An "indispensable party" is a person who should be joined but *cannot* be joined for reasons such as venue or jurisdiction. *See* Fed.R.Civ.P. 19(b).

*Id.* at 1187 n. 2 (emphasis in the original). However, a "necessary party" is one identified by consideration of the factors in Rule 19(a). *Id.* at 1187. If a party is merely a "necessary" party, "the proper procedure under Rule 19(a) is to give the parties an opportunity to bring in such a party, not to dismiss the action." *Id.* (citing *Warner v. First Nat'l Bank of Minneapolis,* 236 F.2d

853, 857–58 (8th Cir.), *cert. denied,* 352 U.S. 927, 77 S.Ct. 226, 1 L.Ed.2d 162 (1956)). A court does not err by refusing to dismiss for failure to join a "necessary" party who is within the venue and jurisdiction of the district court, but whom the present parties fail to join. *Id.* (defendant failed to join person within jurisdiction and venue of court, and "merely raised the issue of indispensability, and then moved to dismiss the suit after the district court's joinder deadline had passed. Any notion that the district court erred in refusing to dismiss the suit in these circumstances is wholly without merit."); *and compare Sladek,* 880 F.2d at 980 ("dismissal *with prejudice* should ordinarily result only after the court has ordered the party joined and the plaintiff has failed to do so.").

▇▇▇ Rule 19 itself states the factors the court is to consider in determining whether or not a person is either a "necessary" or "indispensable" party. *See, e.g., Gwartz,* 23 F.3d at 1428–30 (considering each of the Rule 19(a) factors in turn); *Allright Missouri, Inc. v. Billeter,* 829 F.2d 631, 643 (8th Cir.1987) (Rule 19(a) states factors for determining whether a party is "necessary"); *see also Boulevard Bank,* 15 F.3d at 1422–23 & n. 5 (Rule 19(a) and (b) factors identified and applied in a Rule 12(b)(7) analysis, with citations to cases from the Seventh Circuit applying these factors); *Keweenaw Bay Indian Community,* 11 F.3d at 1346–48 (in Rule 12(b)(7) analysis, the court examined factors specified in Rule 19(a) and (b)). The

---

**35.** In *Gwartz,* the court also held that "[w]e review de novo any conclusions of law informing the district court's Rule 19(a) determination," *Gwartz,* 23 F.3d at 1428, which suggests that the *de novo* review standard should also apply to a dismissal pursuant to Fed.R.Civ.P. 12(b)(7), because a Rule 19 determination forms the basis for disposition of a Rule 12(b)(7) motion. However, *Gwartz* may not resolve the question of the applicable standard of review, because in *State of South Dakota v. Bourland,* 949 F.2d 984, 989 (8th Cir.1991), *rev'd on other grounds,* ── U.S. ──, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), the court stated that "[w]e review trial court determinations of indispensability under Fed.R.Civ.P. 19 for abuse of discretion." In *Bourland,* the court recognized the split in authority over the proper standard of review for Rule 19 determinations. *Bourland,* 949 F.2d at 989 (citing for the abuse of discretion standard *Reserve Mining Co.*

*v. Environmental Protection Agency,* 514 F.2d 492, 534 (8th Cir.1975), *modified on other grounds, Reserve Mining Co. v. Lord,* 529 F.2d 181 (8th Cir.1976); *accord Sindia Expedition v. Wrecked and Abandoned Vessel,* 895 F.2d 116, 121 (3rd Cir.1990); *Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 635 (1st Cir.1989); *McVay v. Western Plains Serv. Corp.,* 823 F.2d 1395, 1401 (10th Cir.1987); *Northern Alaska Envtl. Ctr. v. Hodel,* 803 F.2d 466, 468 (9th Cir.1986); *Pulitzer–Polster v. Pulitzer,* 784 F.2d 1305, 1309 (5th Cir.1986), but citing *Local 670 v. International Union, United Rubber, Cork, Linoleum and Plastic Workers,* 822 F.2d 613, 619 (6th Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988), as holding that determination of indispensability is a legal conclusion subject to *de novo* review). However, as *Gwartz* shows, the *Bourland* decision did not settle the matter for the courts of this circuit.

conditions making a party "necessary" under Rule 19(a) are as follows:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the persons ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

*Fed.R.Civ.P.* 19(a). The requirement under Rule 19(a)(1) that complete relief be available does not mean that every type of relief sought must be available, only that meaningful relief be available. *Henne v. Wright*, 904 F.2d 1208, 1212 n. 3 (8th Cir.1990) (citing 3A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 19.07–1[1] (2d ed. 1989)), *cert. denied*, 498 U.S. 1032, 111 S.Ct. 692, 112 L.Ed.2d 682 (1991). The absent person's ability to protect its interests under *Fed.R.Civ.P.* 19(a)(2)(i) may be met by the presence of defendants capable of making every argument on the merits that the absent person would or could make. *Id.* (citing *Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir.1984)).

Rule 19(b) sets forth the analysis a court must undertake to ascertain whether a party is indispensable, and, thus, one in whose absence the action should be dismissed. Rule 19(b) is, of course, meant to be read in conjunction with Rule 19(a), which addresses the joinder of necessary parties. *Rochester Methodist Hosp.*, 728 F.2d at 1016–17. The district court is to use the factors enumerated in Rule 19(b) and in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109–12, 88 S.Ct. 733, 737–40, 19 L.Ed.2d 936 (1968), to evaluate whether the action should proceed. *Bourland*, 949 F.2d at 989. Rule 19(b) states that the following factors should be considered:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Fed.R.Civ.P.* 19(b). Additionally,

> Rule 19(b) suggests four 'interests' that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled.... First, the plaintiff has an interest in having a forum.... Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another.... Third, there is the interest of the outsider whom it would have been desirable to join.... Fourth, there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies.

*Nichols v. Rysavy*, 809 F.2d 1317, 1332 (8th Cir.) (quoting *Provident Tradesmens Bank & Trust Co.*, 390 U.S. at 109–11, 88 S.Ct. at 737–39), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987).[36] Rule 19(b) requires the court to undertake "a practical examination of the circumstances." *Provident Tradesmens Bank & Trust Co.*, 390 U.S. at 119–20 n. 16, 88 S.Ct. at 743–44 n. 16; *Nichols*, 809 F.2d at 1332. Thus,

> [w]hether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of

---

**36.** By way of comparison, the Seventh Circuit Court of Appeals in *Boulevard Bank*, 15 F.3d at 1423 n. 5, recognized that *Provident Tradesmens Bank & Trust Co.* identifies different factors, but cited the following as relevant to the Rule 19(b) inquiry:

> whether there is potential prejudice to the party to be joined or to the litigants; whether the court can fashion a judgment to avoid such prejudice; whether the court can enter an adequate judgment without the absent party; and whether dismissal of the actions would deprive the plaintiff of an adequate remedy.

These factors are a closer paraphrase of those stated in Rule 19(b) itself.

particular litigation.... [A] court does not know whether a particular person is 'indispensable' until it has examined the situation to determine whether it can proceed without him.

*Id.,* 390 U.S. at 118–19, 88 S.Ct. at 742–43. This attention to the practicalities of the particular case means that "[t]he rule is not to be applied in a rigid manner." *Keweenaw Bay Indian Community,* 11 F.3d at 1346 (quoting *Local 670 v. International Union, United Rubber, Cork, Linoleum and Plastic Workers,* 822 F.2d 613, 619 (6th Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988)). With these standards in mind, the court turns to the merits of defendants' motion to dismiss Count IV.

### 2. Are The Trustees Indispensable Parties?

Although defendants' analysis of this question begins with the factors to be considered under *Fed.R.Civ.P.* 19(b), the court's analysis properly begins with the question of whether or not the trustees are "necessary" parties under *Fed.R.Civ.P.* 19(a) to a claim of set-off of assets belonging to the plaintiffs against Morken's overdrafts at the bank. *Gwartz,* 23 F.3d at 1428 (court must first determine whether party is "necessary" under 19(a) before turning to 19(b) analysis); *Rochester Methodist Hosp.,* 728 F.2d at 1016–17 (Rule 19(b) must be read in conjunction with Rule 19(a) analysis); *see also Boulevard Bank,* 15 F.3d at 1422–23 (in 12(b)(7) analysis, court begins with Rule 19(a), and only if those requirements are met, does court consider Rule 19(b)); *Keweenaw Bay Indian Community,* 11 F.3d at 1346–47 (analysis under Rule 12(b)(7) begins with Rule 19(a)); *Bank One Texas,* 968 F.2d at 100 (if absent party is not necessary under 19(a), they cannot be indispensable under 19(b), and Rule 12(b)(7) motion must fail); *Moore,* 901 F.2d at 1447 (Rule 19(a) provides the "threshold" analysis to indispensability); *McLaughlin,* 847 F.2d at 621 (Only if party is necessary under rule 19(a) does court proceed to next step in 12(b)(7) analysis considering question of indispensability under 19(b)). The court concludes that the trustees to not satisfy either of the Rule 19(a) factors making them necessary parties.

### a. Necessary party under Rule 19(a)

First, under Rule 19(a), the court must consider whether in the person's absence complete relief cannot be accorded among those already parties. Under this factor, the focus is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person. *Gwartz,* 23 F.3d at 1428; *LLC Corp.,* 703 F.2d at 305. Defendants' assertion of the possibility of further litigation between them and the absent trustees is, at best, speculative. Neither trustee is pursuing the assets allegedly set-off against Morken's overdrafts. Morken's trustee has abandoned all assets of the Adventure Cattle program, and SGLE's trustee has never asserted an interest in those assets. Thus, in the absence of the trustees, it appears that complete relief *can* be accorded among those already parties. *Fed.R.Civ.P.* 19(a)(1). Furthermore, the trustees do not claim an interest relating to the subject of the action. *Fed.R.Civ.P.* 19(a)(2).

Furthermore, plaintiffs correctly argue that the cause of action to recover Adventure Cattle assets allegedly set-off against Morken's overdrafts "belongs" to the creditors, and not to the bankruptcy estates, and therefore this cause of action could not be pursued by the trustees. In *Matter of Educators Group Health Trust,* 25 F.3d 1281, 1283 (5th Cir.1994) (hereinafter *"Educators Group Health"*), the Fifth Circuit Court of Appeals concluded that because causes of action of the debtor are among the assets of the bankruptcy estate, citing *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 245 (5th Cir.1988) (citing 11 U.S.C. § 541(a)(1)); *see also United States v. Inslaw, Inc.,* 932 F.2d 1467, 1471 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992), if a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim. *Id.* at 1283–84 (citing *Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1153–54 (5th Cir.1987)); *In re Rare Coin Galleries of Am., Inc.,* 862 F.2d 896, 901 (1st Cir.1988); *Jones v. Harrell,* 858 F.2d 667, 669 (11th Cir.1988); *In re Ozark Restaurant Equip. Co., Inc.,* 816 F.2d 1222, 1225 (8th Cir.) (hereinafter *"Ozark Restaurant"*)

("causes of action belonging to the *debtor* at the commencement of the case are included within the definition of property of the estate," with emphasis in the original), *cert. denied sub nom. Jacoway v. Anderson,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). The Eighth Circuit Court of Appeals has given as examples of causes of action belonging to the debtor

> an action for damages on behalf of a debtor corporation against corporate principals for alleged misconduct, mismanagement, or breach of fiduciary duty, because these claims could have been asserted by the debtor corporation, or by its stockholders in a derivative action.

*Id.* at 1225.

■ If, instead, the cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action. *Educators Group Health,* 25 F.3d at 1284 (citing *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 433–34, 92 S.Ct. 1678, 1688, 32 L.Ed.2d 195 (1972); *In re Rare Coin Galleries of America, Inc.,* 862 F.2d at 900); *Ozark Restaurant,* 816 F.2d at 1225. The trustee cannot pursue a claim that properly belongs to the creditors even if the creditors assign the claim to the trustee. *Williams v. California 1st Bank,* 859 F.2d 664, 667 (9th Cir.1988) (creditors could not assign trustee causes of action that bank had participated in, had knowledge of, or approved of debtor's scheme to violate state and federal securities laws, citing *Caplin* ); *see also Steinberg v. Buczynski,* 40 F.3d 890, 893 (7th Cir.1994) ("the trustee is confined to enforcing entitlements of [the debtor]. He has no right to enforce entitlements of a creditor"). It follows that if a cause of action belongs to the estate's creditors, and not to the estate, the trustee cannot be a necessary party to the action.

■ In determining whether or not a particular state cause of action belongs to the estate or its creditors, the court looks to applicable state law to determine whether the debtor could have raised the claim as of the commencement of the case. *Educators Group Health Trust,* 25 F.3d at 1283; *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir.1989); *S.I.*

*Acquisition,* 817 F.2d at 1142. However, the Fifth Circuit Court of Appeals concluded that the appropriate standard for determining whether a cause of action belongs to the estate or the creditors is as follows:

> If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. *See, e.g., S.I. Acquisition,* 817 F.2d at 1152–53. . . . Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.

*Educators Group Health Trust,* 25 F.3d at 1283; *In re Rare Coin Galleries of Am., Inc.,* 862 F.2d at 900–901 (damage to debtor determines whether the trustee has standing to bring the cause of action). Applying this rule, the court concluded that the following causes of action belonged to the creditors: (1) claims based on the state's deceptive practices act, and claims of conspiracy to violate the act; (2) claims based on violation of the state's insurance code; (3) claims based on fraud, and conspiracy to commit fraud; (4) claims based on negligence, to the extent such claims were based on breach of a duty to the creditors; and (5) claims of negligently misrepresenting the financial status of the debtor to the creditors. *Id.* at 1286.

■ The court concludes that plaintiffs' claim here of wrongful conversion or set-off alleges direct injury to them, and only indirect harm, if any, to Morken. Any set-off of funds against Morken's overdrafts obviously inured to his benefit as between Morken and the defendants. However, it directly injured the plaintiffs if they indeed had an interest in those funds superior to any that could be asserted by either the defendants or the bankruptcy estates. The court concludes that the causes of action asserted in Count IV belonged only to the creditors, and therefore the bankruptcy trustees are not necessary parties to disposition of those claims. Defendants' motion to dismiss Count IV for

failure to join indispensable parties should therefore be dismissed.

### b. *Indispensable party under Rule 19(b)*

Because the court has determined that the bankruptcy trustees are not "necessary" parties under Rule 19(a), they cannot be "indispensable" parties under Rule 19(b). The court therefore need not consider defendants' various arguments that the trustees are "indispensable" under Rule 19(b). *Gwartz*, 23 F.3d at 1428; *Rochester Methodist Hosp.*, 728 F.2d at 1016–17; *see also Boulevard Bank*, 15 F.3d at 1422–23; *Keweenaw Bay Indian Community*, 11 F.3d at 1346–47; *Bank One Texas*, 968 F.2d at 100; *Moore*, 901 F.2d at 1447; *McLaughlin*, 847 F.2d at 621. Defendants' motion to dismiss Count IV for failure to join indispensable parties must be denied. However, the court will nonetheless dismiss this count of the complaint as well, because the court lacks a federal question upon which to base pendent jurisdiction over this state law claim, as is explained further immediately below in section G.

### G. *Lack Of A Federal Question*

The dismissal of Counts I, II, and III leaves this case without a federal question upon which to base federal court jurisdiction. The court must therefore consider whether or not to retain jurisdiction over the pendent state law claim in Count IV.[37]

Prior to enactment of the federal supplemental jurisdiction statute, 28 U.S.C. § 1367, in 1990, a federal court's authority to exercise pendent jurisdiction over a state law claim was a matter of discretion involving the weighing of several factors:

> In [*United Mine Workers v.*] *Gibbs*, [383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966),] the Court set out the basic principles which should be applied where federal and state claims are presented together. First, the federal claim must be substantial enough for the vesting of subject-matter jurisdiction. Second, the federal and state claims must present one constitutional "case." If they derive from a common nucleus of operative fact, and if aside from their federal or state character, they normally would be tried in one proceeding, this element is present. Third, even if the court has the power in a constitutional sense to hear the entire case, it need not do so, for "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." 383 U.S. at 726, 86 S.Ct. at 1139. The exercise of the court's discretion involves "considerations of judicial economy, convenience and fairness to litigants" and "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." *Ibid.*

*Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1345–46 (8th Cir.1980); *see also Hess v. St. Joseph Police Pension Fund*, 788 F.2d 1344, 1346 (8th Cir.1986) (discretion to entertain state claims should be exercised when judicial economy, convenience, and fairness weigh in favor of adjudication of the state claims). The advantages of adjudication of state law claims with federal claims are realized when the claims require similar types of proof and there is no prejudice to the parties as the result of hearing both claims. *Hess*, 788 F.2d at 1347. Review of the court's exercise of pendent jurisdiction must be made "at every stage of the litigation." *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (citing the *Gibbs* factors). In the absence of an independent basis of jurisdiction, "when the federal claim drops out before trial, and a complete trial of the facts would be necessary to determine the state claim, the federal court should not proceed with such a trial." *Curtis v. Sears, Roebuck and Co.*, 754 F.2d 781, 785 (8th Cir.1985).

Most of the factors involved in the court's analysis of whether or not to exercise pendant jurisdiction stated above are retained and codified in the statute defining the supplemental jurisdiction of the federal courts:

> [I]n any civil action of which the district courts have original jurisdiction, the dis-

---

**37.** The court has also concluded that the state-law fraud claim in Count V is insufficiently pleaded and must also be dismissed. Hence, the state-law claim in Count IV is the only claim remaining.

trict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a) (West Supp.1991). A court "may decline to exercise supplemental jurisdiction" if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (West Supp.1991). Where the case clearly fits within one of the subsections listed above, the court may decline to exercise supplemental jurisdiction. *Packett v. Stenberg*, 969 F.2d 721, 726–27 (8th Cir.1992). *See also O'Connor v. State of Nev.*, 27 F.3d 357, 362 (9th Cir.1994); *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1285 n. 14 (3d Cir.1993); *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 65–66, n. 3 (2nd Cir.1991); *Carroll v. Borough of State College*, 854 F.Supp. 1184, 1200 (M.D.Pa.1994), *aff'd mem.*, 47 F.3d 1160 (3d Cir.1995).

Here, the case now stands in the circumstances identified in 28 U.S.C. § 1267(c)(3): the district court has dismissed all claims over which it has original jurisdiction. Therefore, the court declines to exercise supplemental jurisdiction over the remaining state-law claim, and this matter must be dismissed in its entirety. Plaintiffs may refile their state-law claim of wrongful set-off or conversion, and an adequately pleaded claim of common-law fraud, in state court pursuant to Iowa's "failure of action" statute.[38]

## III. CONCLUSION

The court believes that everyone concerned would benefit from a summary of its conclusions concerning the difficult and interrelated issues the court has been compelled to resolve in disposing of the defendants' motion to dismiss. The court concludes that defendants' motion to dismiss federal claims pursuant to *Fed.R.Civ.P.* 12(b)(6) must be granted.

Plaintiffs' RICO claim must be dismissed, because it fails to plead sufficiently the elements of a RICO offense under 18 U.S.C. § 1962(c). First, the court concludes that plaintiffs complaint is deficient on the critical threshold allegation of "conduct" of a RICO enterprise by the defendants. The complaint does not allege that defendants participated in the conduct of Morken's RICO enterprise itself. Rather, it alleges only that defendants conducted that enterprise's banking

---

**38.** Iowa Code § 614.10, Iowa's "failure of action" statute, provides as follows:

If, after the commencement of an action, the plaintiff, for any cause except negligence in its prosecution, fails therein, and a new one is brought within six months thereafter, the second shall, for the purposes herein contemplated, be held a continuation of the first.

In order for a plaintiff's cause of action to come within section 614.10, there are four requirements:

1. The failure of a former action not caused by plaintiff's negligence.

2. The commencement of a new action brought within six months thereafter.

3. The parties must be the same.

4. The cause of action must be the same. *Beilke v. Droz*, 675 F.2d 194, 195 (8th Cir.1982) (citing *Hartz v. Brunson*, 231 Iowa 872, 2 N.W.2d 280, 283 (1942)). In *Beilke*, the U.S. District Court for the Eastern District of Wisconsin had dismissed a lawsuit against the insurer on the ground that the insurer may not be sued directly under a Wisconsin statute. *Id.* The suit was refiled in federal court in Iowa, and the court determined that Iowa Code § 614.10 would permit the action to go forward if the insured and the insurer were the "same party" within the meaning of the statute. *Id.* The Eighth Circuit Court of Appeals certified to the Iowa Supreme Court the question of whether an insured and its insurance company were "the same" within the meaning of the statute. *Id.* The Iowa Supreme Court answered in the affirmative. *Id.* In the present case, the court sees no reason why plaintiffs could not meet the requirements of the Iowa "failure of action" statute to refile their state-law claims in Iowa district court, even if they would otherwise be time barred, because they were timely filed in federal court and have been dismissed through no fault of the plaintiffs'.

scheme. As alleged, the court concludes that defendants' conduct was one step removed from management of the RICO enterprise itself, and thus liability will not lie under § 1962(c). Although the parties concede that Morken's enterprise was a RICO enterprise, the second element of a RICO claim, defendants simply did not "conduct" it. As to the third element of a RICO claim, allegations of a pattern of prohibited conduct, the court concludes that it should not decide what the Eighth Circuit Court of Appeals has consistently refused to decide, which is the question of what time frame for predicate acts is sufficient as a matter of law to support a RICO claim. However, the court considers that what is fatal to the RICO allegations here is the absence of factual allegations identifying with sufficient specificity any predicate acts such that the court can determine in what way they may or may not be related. Asserting that some group of victims, without identifying who the specific members are or of what acts each was a victim, was subjected to unidentified deceptive acts by use of the mails and wires by unidentified actors at unspecified times within a period of several months is inadequate as a matter of law to demonstrate or to allege a RICO "pattern."

The court also concludes that the complaint inadequately pleads RICO predicate acts, the fourth element of a RICO claim. The complaint fails to meet the requirements of *Fed.R.Civ.P.* 9(b) in its pleading of mail and wire fraud. A generous reading of the complaint would find the pleadings adequate only as to intent to defraud and, perhaps, the manner in which the communications were fraudulent and furthered a scheme to defraud. However, the pleadings are wholly lacking in the requisite details of time, place, and content of the alleged mail and wire communications perpetrating the alleged frauds. The court also concluded that defendants had failed to allege a securities fraud predicate act, and that the bankruptcy fraud claims were not plead with the particularity required. The bankruptcy fraud claim could, perhaps, be pleaded sufficiently after discovery of information peculiarly within the control of the defendants, but that claim alone, even if it is adequately pleaded or could be so

pleaded after discovery, cannot sustain a RICO claim, because there is no pattern of other predicate acts to which it could be shown to belong.

The court also concludes that plaintiffs have failed to state claims of securities laws violations. First, the court concludes that the Adventure Cattle contracts are not "securities" subject to the securities laws. Based on its application of the *Howey* test to the particular contracts in question here, the court concludes that the investment scheme lacks either horizontal commonality, which this court believes should be required, or vertical commonality, if such is sufficient to show a common enterprise. Furthermore, the court concludes that the investment was structured in such a way that investors did not rely on the efforts of others to make the investments profitable, because they did not look to Morken for expertise or decisions concerning management of their own investment. Furthermore, Adventure Cattle investors did not receive "profits," but a guaranteed 25% annualized return on their investment. Morken enjoyed success beyond that guarantee, and suffered performance below it, but investors enjoyed returns that were not tied to dividends or the profitability of the enterprise in general. Thus, the Adventure Cattle contracts fail all elements of the *Howey* test except investment of money, and are not "securities."

Furthermore, the court concludes that defendants were not parties who could be held liable for the sale of the Adventure Cattle contracts even if they are "securities." The court concludes that it would be possible for plaintiffs to prove a set of facts from which a factfinder could conclude that defendants "solicited" investors in Adventure Cattle, but that whether or not defendants were "sellers" on the basis of adequate proof of solicitation is a moot question if the contracts involved were not "securities." However, the court concluded that liability would not lie against the defendants on the alleged securities law violations on the grounds that the defendants either were "control persons" or failed to make disclosures. The defendants did not exercise powers over Morken's operations from which "control person" liability

could arise. Nor did a duty to disclose arise in the circumstances alleged here.

Turning to plaintiffs' state law claims, the court concludes that the allegations of common-law fraud also do not meet the heightened pleading requirements for fraud under *Fed.R.Civ.P.* 9(b). Turning to the more involved question of whether defendants were entitled to dismissal of the claim of wrongful conversion or set-off pursuant to *Fed. R.Civ.P.* 12(b)(7) on the ground that the trustees of Morken's and SGLE's bankruptcy estates were indispensable parties, the court concludes that the trustees are not such parties. The court concludes that the trustees are not "necessary" parties under Rule 19(a), because defendants' assertion of the possibility of further litigation between them and the absent trustees is, at best, speculative. Neither trustee is pursuing the assets allegedly set-off against Morken's overdrafts. Furthermore, the court concludes that any cause of action for set-off properly "belongs" to the creditors, and not to the bankruptcy estate. Having failed to meet the threshold requirements of Rule 19(a), the trustees cannot be indispensable parties under Rule 19(b). That part of the motion to dismiss seeking the dismissal of Count IV for failure to join indispensable parties must therefore be denied.

Having concluded that all federal claims must be dismissed, the court concludes further that it should decline to exercise supplemental jurisdiction over the only surviving state-law claim. Finally, because the entire complaint has been dismissed, the court must also dismiss the third-party complaint, which was based solely on a contribution claim in the event the defendants were found liable on any of the claims in the plaintiffs' complaint, because there is no independent claim presented by the third-party complaint requiring adjudication in the absence of a viable claim between the principal plaintiffs and the principal defendants. This matter must therefore be dismissed in its entirety.

**IT IS SO ORDERED.**